**Donald CARLETON and Harold Carleton, Plaintiffs,**

v.

**VERMONT DAIRY HERD IMPROVEMENT ASSOCIATION, INC., et al., Defendants.**

Civ. A. No. 90–227.

United States District Court,
D. Vermont.

Nov. 12, 1991.

---

J. Scott Cameron, Ralph W. Howe, III, Paterson & Walke, Montpelier, Vt., for plaintiffs.

W. John McNally, III, Teachout, Brooks, Moore & McNally, Norwich, Vt., Daniel S. Koch, Kurz, Koch, Doland & Dembling, Washington, D.C., for defendants Vermont Dairy Herd Imp. Ass'n, Inc., Corinth Dairy Herd Imp. Ass'n, David Hastings, Larry Martin, Robert Albrecht, Peggy Hewes, George Braley, Caledonia Dairy Herd Imp. Ass'n, Washington County Dairy Herd Improvement Ass'n, Central Orange County Dairy Herd Imp. Ass'n, Orleans County Dairy Herd Imp. Ass'n, Carroll Wright, Fred Stone, Melanie Carmichael, Kim Harvey, Carl Cobb, John Ellsworth, Paul Doton, Maurice Maxwell, Lee Kayhart, John Campbell, Richard Brouillette, Stephen Eddy, Hezzie Sommers, Jerry Lawson, Kendall Maynard, John Pease, Roger Scott, William Knox, Walter Gladstone, Raymond Knox and Cindy Frazee.

Gary H. Barnes, Downs Rachlin & Martin, Burlington, Vt., John Stuart Smith, Nixon, Hargrave, Devans & Doyle, Rochester, N.Y., for defendants Northeast Dairy Herd Imp. Ass'n, Inc. and Nelvin Empet.

## OPINION AND ORDER

PARKER, Chief Judge.

Plaintiffs, owners of Holstein cattle in Newbury, Vermont, sued defendants, associations and persons that test milk production of Vermont dairy herds and keep related records, alleging violations of federal antitrust laws, 15 U.S.C. §§ 1, 2,[1] as well as certain pendent state law claims. The Vermont Dairy Herd Improvement Association, Inc. on behalf of all the Vermont-based defendants (hereafter "the Vermont defendants") and the two defendants from out of state (Nelvin Empet and the Northeast Dairy Herd Improvement Association, Inc.) each move to dismiss on the ground that the complaint fails to allege all the essential elements of the federal claims, and that, absent the federal claims, this court has no jurisdiction over the state law claims.[2]

For the reasons stated below, the Vermont defendants' motion to dismiss is DENIED and the NEDHIA/Empet motion to dismiss is GRANTED.

---

**1.** Section 1 of the Sherman Act provides in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.

Section 2 of the Sherman Act penalizes "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2.

A private right of action to redress Sherman Act violations is provided in Section 4 of the Clayton Act: "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in ... [federal] district court ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a).

**2.** The state law claims—tort, breach of contract, and interference with contract—make no allegations concerning the two non-Vermont defendants, Nelvin Empet and Northeast Dairy Herd Improvement Association. Accordingly, the state law claims are dismissed as to these defendants for failure to state a claim upon which relief may be granted.

## BACKGROUND

Accepting plaintiffs' allegations in the amended complaint as true for purposes of this motion, the following facts may be briefly stated. Plaintiffs, Donald Carleton and his son, Harold Carleton, are the proprietors of Maple Grove Farm, a dairy farm devoted to the breeding, raising, showing and marketing of registered Holstein cattle. The operation includes interstate sales. Donald Carleton was a member of an unincorporated regional association of dairy farmers, the Corinth Dairy Herd Improvement Association (CDHIA), whose members and directors include competitors of plaintiffs. CDHIA and the other local dairy herd improvement associations (DHIAs) listed as defendants are affiliates of the Vermont Dairy Herd Improvement Association, Inc. (VDHIA), whose members also compete with plaintiffs. Also a defendant is the Northeast Dairy Herd Improvement Association, Inc. (NEDHIA), a similar organization active in New York and New Hampshire. The individual defendants are officers, directors, trustees or employees of one or another named DHIA.

The DHIAs employ milk testers who visit the member farms unannounced in order to test the herds to establish official lactation records for each milking animal. The maintenance of these records is essential to the breeders, since the value of registered dairy animals is greatly reduced if official association records are unavailable. The several DHIAs located in Vermont have a monopoly over official milk testing in the state.

For several years Donald Carleton had "complained vociferously" to the CDHIA and VDHIA that their testers were incompetent and the results of tests performed on his herd were flawed. After an argument with the employee who attempted to test milk production of his herd in March 1989, Donald Carleton was expelled from membership in the CDHIA, without affording him a hearing or notifying him of any complaints against him. When he sought testing services from other local DHIAs and from the NEDHIA, Carleton was turned down because the CDHIA manager, Robert Albrecht, falsely spread the word that Carleton had been expelled for violating DHIA rules. Subsequently VDHIA held a hearing at Carleton's request, at which Carleton was charged with numerous rule violations over several years. Plaintiffs allege that these charges were made maliciously in order to retaliate against Carleton, "to divert attention away from [the DHIA employees'] own failings and to deprive Plaintiff Donald Carleton from the necessary services of DHIA testing and the benefits thereof." The hearing board upheld the suspension of Carleton's herd from the CDHIA and VDHIA and ordered the herd's production records expunged for the preceding two-year period. That decision was based, according to the amended complaint, in part upon unreliable ex parte information and served to cover up the incompetence of DHIA employees. Carleton appealed the decision, which the VDHIA board of trustees affirmed. Harold Carleton then applied for membership in the CDHIA and VDHIA for his herd, but was refused. In consequence of these events, plaintiffs can no longer fairly compete in the business of raising and marketing their animals.

The first three counts of the amended complaint allege violations of sections 1 and 2 of the Sherman Act, the federal antitrust statute. Count I avers that the actions and agreements of the defendants constitute a contract, combination or conspiracy that unreasonably and willfully restrained trade affecting interstate commerce. See 15 U.S.C. § 1. Count II alleges that the defendants intentionally created a monopoly used to exclude competition in the interstate business of breeding, selling, and exhibiting registered Holstein cattle. Count III alleges that the defendants conspired together to commit the acts alleged in count II. See 15 U.S.C. § 2.

## DISCUSSION

### A. THE VERMONT DEFENDANTS' MOTION TO DISMISS

#### 1. *Section 1 of the Sherman Act*

Defendants argue that the claim under § 1 of the Sherman Act must fail because

it lacks an essential element, namely, that ousting the Carletons had any adverse effect on competition in the Holstein market, such as causing prices to rise or supply to tighten. While plaintiffs' ability to engage competitively in the market may have suffered, the complaint fails to allege that the market as a whole suffered an adverse impact as a result of the defendants' actions. To understand this argument and to assess its merit require a brief digression.

Section 1 of the Sherman Act forbids any "contract, combination ... or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. A plaintiff with the requisite standing bringing a civil claim under § 1 must establish two elements: an agreement or conspiracy among the defendants and that the agreement was in restraint of trade affecting interstate commerce. *Oreck Corp. v. Whirlpool Corp.*, 639 F.2d 75, 78 (2d Cir.1980), *cert. denied*, 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981). On its face, the statute has exceedingly broad sweep and would prohibit virtually any commercial agreement; "read literally, § 1 would outlaw the entire body of private contract law." *National Society of Professional Engineers v. United States*, 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978). Consequently, the statute has been read to embrace the concept of "reasonableness." "The legislative history makes it perfectly clear that [Congress] expected the courts to give shape to the statute's broad mandate by drawing on common-law tradition." *Id.* As the Supreme Court stated recently: "Since the earliest decisions of this Court interpreting this provision, we have recognized that it was intended to prohibit only unreasonable restraints of trade." *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 723, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808 (1988) (citing *Standard Oil Co. v. United States*, 221 U.S. 1, 60, 31 S.Ct. 502, 515, 55 L.Ed. 619 (1911)).

Two methods of proof—*per se* and rule-of-reason analysis—have guided the courts in determining whether a particular restraint is unreasonable, that is, "whether its anticompetitive effects outweigh its procompetitive effects." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 110 S.Ct. 1884, 1893, 109 L.Ed.2d 333 (1990).

Ordinarily, whether particular concerted action violates § 1 of the Sherman Act is determined through case-by-case application of the so-called rule of reason—that is, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 [97 S.Ct. 2549, 2557, 53 L.Ed.2d 568] (1977). Certain categories of agreements, however, have been held to be *per se* illegal, dispensing with the need for case-by-case evaluation. We have said that *per se* rules are appropriate only for "conduct that is manifestly anticompetitive," *id.*, at 50 [97 S.Ct. at 2557], that is, conduct " 'that would always or almost always tend to restrict competition and decrease output,' " *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 289–290 [105 S.Ct. 2613, 2617, 86 L.Ed.2d 202] (1985), quoting *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 19–20 [99 S.Ct. 1551, 1562, 60 L.Ed.2d 1] (1979).

*Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. at 723, 108 S.Ct. at 1519. "The *per se* rule is a presumption of unreasonableness based on 'business certainty and litigation efficiency.' ... 'Once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it, it has applied a conclusive presumption that the restraint is unreasonable.' " *Atlantic Richfield Co. v. USA Petroleum Co.*, 110 S.Ct. at 1893 (quoting *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 344, 102 S.Ct. 2466, 2473, 73 L.Ed.2d 48 (1982)). "*Per se* rules are invoked when surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct." *National Collegiate Athletic Ass'n v. Board of Regents of University of*

*Oklahoma,* 468 U.S. 85, 103–04, 104 S.Ct. 2948, 2961, 82 L.Ed.2d 70 (1984). Price-fixing agreements, for example, typically warrant *per se* treatment. *Id.* at 100, 104 S.Ct. at 2959. Thus, the *per se* approach "permits categorical judgments with respect to certain business practices that have proved to be predominantly anticompetitive." *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 289, 105 S.Ct. 2613, 2617, 86 L.Ed.2d 202 (1985).

■ The goal of the inquiry remains constant under either analysis. "Both *per se* rules and the Rule of Reason are employed 'to form a judgment about the competitive significance of the restraint.'" *National Collegiate Athletic Ass'n,* 468 U.S. at 103, 104 S.Ct. at 2961 (quoting *National Society of Professional Engineers v. United States,* 435 U.S. at 692, 98 S.Ct. at 1365). The methodological choice has substantial practical consequences, however; if a plaintiff establishes that the restraint warrants *per se* treatment, unreasonableness is presumed and liability under the Sherman Act is proved without more. Under the rule-of-reason approach, on the other hand, the plaintiff must put on evidence of anticompetitive effect, to be weighed against whatever benefits to competition are generated by the challenged conduct. The rule in the Second Circuit is explicit: "Unlike a *per se* price-fixing case, a Rule-of-Reason case requires the fact finder to balance the procompetitive and anticompetitive *effects* of any restraint." *U.S. Football League v. National Football League,* 842 F.2d 1335, 1360 (2d Cir.1988) (emphasis in original). An intent to exclude competition is not by itself sufficient to establish a § 1 violation. *Id.* "Animosity, even if rephrased as 'anticompetitive intent', is not illegal without anticompetitive effects." *Schachar v. American Academy of Ophthalmology, Inc.,* 870 F.2d 397, 400 (7th Cir.1989).

■ Plaintiffs contend that the allegations in their complaint charge defendants with a "group boycott" and a "concerted refusal to deal" with plaintiffs, conduct that requires application of the *per se* rule.

Defendants maintain to the contrary that the rule of reason should control, and because the complaint fails to allege any adverse effects on the Holstein market in which plaintiffs competed, it must be dismissed under *U.S. Football League* for failure to plead the essential elements of a § 1 claim. Both sides begin with a sound premise but draw an unsound inference.

■ The court agrees with plaintiffs in their contention that the complaint alleges behavior on the part of defendants that may properly be described as a group boycott or a concerted refusal to deal. See *Volvo North American Corp. v. Men's Int'l Professional Tennis Council,* 857 F.2d 55, 73 (2d Cir.1988). Furthermore, the Supreme Court "has long held that certain concerted refusals to deal or group boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as *per se* violations of § 1 of the Sherman Act." *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. at 290, 105 S.Ct. at 2617. But the Court has also made clear that not all group boycotts and concerted refusals to deal warrant *per se* invalidation. "A plaintiff seeking application of the *per se* rule must present a threshold case that the challenged activity falls into a category likely to have predominantly anticompetitive effects. The mere allegation of a concerted refusal to deal does not suffice because not all concerted refusals to deal are predominantly anticompetitive." *Id.* at 298, 105 S.Ct. at 2621.

Indeed, *Northwest Wholesale Stationers* is precisely a group boycott case not mandating, in the Court's view, *per se* condemnation. Evaluating antitrust claims brought against a cooperative buying agency comprised of various retailers that expelled one of its members, the Court concluded: "The act of expulsion from a wholesale cooperative does not necessarily imply anticompetitive animus and thereby raise a probability of anticompetitive effect. Wholesale purchasing cooperatives must establish and enforce reasonable rules in order to function effectively." *Id.* at 296, 105 S.Ct. at 2620. Similarly, in

*Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988), the Court noted that

> private standard-setting associations have traditionally been objects of antitrust scrutiny. When, however, private associations promulgate safety standards based on the merits of objective expert judgments and through procedures that prevent the standard-setting process from being biased by members with economic interests in stifling product competition, those private standards can have significant procompetitive advantages. It is this potential for procompetitive benefits that has led most lower courts to apply rule-of-reason analysis to product standard-setting by private associations.

*Id.* at 500–501, 108 S.Ct. at 1937 (citations omitted). See also *Consolidated Metal Products, Inc. v. American Petroleum Institute,* 846 F.2d 284, 292 (5th Cir.1988) (no *per se* violation where standard-setting trade association that evaluates products and issues opinions, without constraining others to follow its recommendations, unjustifiably failed to certify a product).

The same reasoning controls here. A member of a Dairy Herd Improvement Association may be expelled for valid or invalid reasons. The mere acts of expulsion and group boycott of a member do not entail either anticompetitive animus or predominantly anticompetitive effects, for the expulsion and boycott of a member who flouts the rules of the Association or prevents the impartial collection of data from his or her herd, while damaging the member's ability to compete, might have largely beneficial effects on competition in the market for Holstein animals. Indeed, DHIAs are established precisely in order to enhance the value of their members' herds and to encourage fair competition. In my view, this is manifestly not a case where the "surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct," *National Collegiate Athletic Ass'n,* 468 U.S. at 103–04, 104 S.Ct. at 2961. See *Pretz v.*

*Holstein Friesian Ass'n of America,* 698 F.Supp. 1531, 1539 (D.Kan.1988) (cattle registry association's suspension of cattle breeder's privileges not subject to *per se* analysis).

Accordingly, violation of the antitrust laws are not to be conclusively presumed from the allegations in the amended complaint of defendants' boycott of and concerted refusal to deal with the Carletons. Rather, plaintiffs must be put to their burden to demonstrate the unreasonableness of defendants' conduct. A contrary rule would render virtually any attempt by a DHIA to enforce its standards illegal under the Sherman Act. See *id.* ("To conclude that the HFAA's (or any similar organization's) actions in enforcing its rules and regulations are automatically subject to a *per se* analysis would completely undermine the association's operations and would prevent the HFAA's achieving its purpose—improving the breed of Holstein-Friesian dairy cattle—which ultimately has a positive impact on competition.").

The fact that plaintiffs allege that they were denied due process in the course of their expulsion from the DHIAs does not affect the choice of method. The Court in *Northwest Stationers* was explicit on this point. "[T]he absence of procedural safeguards can in no sense determine the antitrust analysis.... If the challenged action would not amount to a violation of § 1, no lack of procedural protections would convert it into a *per se* violation because the antitrust laws do not themselves impose on joint ventures a requirement of process." 472 U.S. at 293, 105 S.Ct. at 2619. The due process issues, of course, may factor into the rule-of-reason analysis.

Plaintiffs seize on one passage in *Northwest Stationers* in support of their argument for *per se* condemnation of the defendants' actions: "Unless the cooperative possesses market power or exclusive access to an element essential to effective competition, the conclusion that expulsion is virtually always likely to have an anticompetitive effect is not warranted." *Id.* at 296, 105 S.Ct. at 2620–21. Plaintiffs

point out that membership in the defendant Associations provides exclusive access to official lactation testing and record-keeping, services that are essential to compete effectively in the market to sell Holstein cattle. That may be so, but it simply does not follow that expulsion from the DHIAs is virtually always likely to have an anticompetitive effect. The sentence quoted from *Northwest Stationers* says only that "market power or exclusive access" is a necessary precondition before expulsion from a cooperative should be deemed *per se* unreasonable. Neither market power nor exclusive access is a sufficient condition, however. The mere fact that membership in DHIAs may provide exclusive access to essential facilities does not justify *per se* invalidation where other "surrounding circumstances" suggest, as here, that the challenged conduct should be weighed under the rule of reason. The rule of reason is therefore the correct method of proof in this case.

▮▮▮▮ As mentioned above, defendants also urge that, under rule-of-reason analysis, dismissal is required because the complaint fails to allege any adverse effects on the Holstein market in which plaintiffs competed.[3] (Vermont defendants do not dispute that the other elements of a § 1 claim—joint action, standing and damages—are properly pleaded.) True, plaintiffs have the burden to prove that the anticompetitive effects of the defendants' conduct outweigh the procompetitive effects. But defendants would require too much. Plaintiffs are not burdened with establishing that the particular restraint on trade actually produced higher prices or reduced the supply of animals in the market. The small participant in the market is as worthy of protection by the antitrust laws as the mighty. See *Klor's, Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 213, 79 S.Ct. 705, 710, 3 L.Ed.2d 741 (1959). "[T]he inquiry mandated by the Rule of Reason is whether the challenged agreement is one that promotes competition or one that suppresses competition." *Nation-*

*al Society of Professional Engineers*, 435 U.S. at 691, 98 S.Ct. at 1365. A conspiracy unreasonably to deprive a competitor of a facility essential to competition may suppress competition. Cf. *Schachar v. American Academy of Ophthalmology, Inc.*, 870 F.2d at 398 (no restraint of trade under § 1 as matter of law where association of ophthalmologists characterized radial keratotomy, a type of eye surgery, as experimental and called for further research, but "did not expel or discipline or even scowl at members who performed radial keratotomies"). It is up to the factfinder to determine whether the defendants unreasonably withheld an essential service from the Carletons *and* whether the effect of such action is likely to be anticompetitive.

These conclusions are in accordance with the Supreme Court's recent decision in *Summit Health, Ltd. v. Pinhas,* —— U.S. ——, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991), a case concerned primarily with the jurisdictional requirement of *interstate* commercial effects of a § 1 violation. Alleging a conspiracy to drive him out of business, Simon Pinhas, a prominent ophthalmologist in the Los Angeles area, sued the hospital where he practiced and its medical staff after his privileges were denied by a peer-review committee. The defendants argued that the complaint was "insufficient because there is no factual nexus between the restraint on this one surgeon's practice and interstate commerce." *Id.* 111 S.Ct. at 1847. That is a similar argument to the defendants' in the present case—that the complaint is insufficient because it makes no allegation that a restraint on the Carletons' ability to compete in the Holstein market will have an effect on the market in general. (Defendants here do not contest the interstate character of the relevant market—only that the relevant market is not significantly affected.)

The Supreme Court rejected the challenge. First, the Court held that "proper analysis focuses, not upon actual conse-

---

**3.** To the extent this is an argument that the complaint is defective, it appears to this court that the allegation of a § 1 violation carries with it an allegation of likely anticompetitive effect under the notice pleading standard of the Federal Rules.

quences, but rather upon the potential harm that would ensue if the conspiracy were successful," and therefore "an actual effect on interstate commerce" need not be alleged to support federal jurisdiction. *Id.* at 1847–48. Second, and more pertinent here, the Court held that "a reduction in the provision of ophthalmological services in the Los Angeles market," which would ensue if the alleged conspiracy were successful, was sufficient to support federal jurisdiction, because "the case is necessarily more significant than the fate of 'just one merchant whose business is so small that his destruction makes little difference to the economy.'" *Id.* at 1848 (quoting *Klor's Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. at 213, 79 S.Ct. at 710). The Court elaborated: "The competitive significance of [Dr. Pinhas'] exclusion from the market must be measured, not just by a particularized evaluation of his own practice, but rather, by a general evaluation of the impact of the restraint on other participants and potential participants in the market from which he has been excluded." *Id.*

▮ The competitive significance of the Carletons' exclusion from the market must similarly be "measured, not just by a particularized evaluation of [their] own [business], but rather, by a general evaluation of the impact of the restraint on other participants and potential participants in the market from which [they have] been excluded." It remains for the plaintiffs to prove and for the factfinder to determine whether the ouster of rule-abiding and successful Holstein breeders from membership in the DHIAs to cover up incompetence and misconduct within the local association, all without due process, as alleged in the amended complaint, is likely to affect substantially other participants and potential participants in the market and, in turn, to reduce competition.

This court concludes that count 1 of the amended complaint properly states a claim against the Vermont defendants under § 1

of the Sherman Act, and their motion to dismiss count 1 is accordingly DENIED.[4]

**2. *Section 2 of the Sherman Act***

▮ Counts 2 and 3 of the amended complaint allege acts of monopolization and conspiracy to monopolize in violation of § 2 of the Sherman Act. Defendants urge dismissal of these counts on the ground that the monopolization, if any exists, is among *testers* of milking animals, and that the plaintiffs are not in *that* line of business, the coincidence of which, defendants assert, is a requirement of a § 2 claim.

This proposition is incorrect as a matter of law. It is true that the typical suit under § 2 of the Sherman Act involves a plaintiff attempting to compete in a market monopolized by the defendant or defendants. But it is not always so. "[T]he use of monopoly power attained in one market to gain a competitive advantage in another is a violation of § 2, even if there has not been an attempt to monopolize the second market." *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 276 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). This process, illegal under the Sherman Act, is known as "monopoly leveraging." See *Kerasotes Michigan Theatres, Inc. v. National Amusements, Inc.,* 854 F.2d 135, 136–37 (6th Cir. 1988), *cert. dismissed,* 490 U.S. 1087, 109 S.Ct. 2461, 104 L.Ed.2d 982 (1989) (antitrust laws forbid use of dominant market position in one area to amplify or leverage a position in another competitive market).

The Second Circuit's seminal decision in *Berkey Photo* is instructive.

Kodak, in the period relevant to this suit, was never close to gaining control of the markets for photofinishing equipment or services and could not be held to have attempted to monopolize them. Berkey nevertheless contends that Kodak illicitly gained an advantage in these areas by leveraging its power over film and cameras. Accordingly, we must determine

---

**4.** The court does not here reach the question whether defendants may be immune from Sherman Act liability under an exemption afforded agricultural cooperatives. See 7 U.S.C. § 291; 15 U.S.C. § 17. That question may be appropriate to consider upon a motion for summary judgment.

whether a firm violates § 2 by using its monopoly power in one market to gain a competitive advantage in another, albeit without an attempt to monopolize the second market. We hold, as did the lower court, that it does.

This conclusion appears to be an inexorable interpretation of the antitrust laws. We tolerate the existence of monopoly power, we repeat, only insofar as necessary to preserve competitive incentives and to be fair to the firm that has attained its position innocently. There is no reason to allow the exercise of such power to the detriment of competition, in either the controlled market or any other.

603 F.2d at 275 (footnote omitted).

Plaintiffs' allegations against the Vermont defendants nicely fit the pattern of monopoly leveraging as described in *Berkey Photo*. Assuming the truth of the allegations, defendants have a monopoly in the business of providing official milk testing services. They have used their power in that market to distort competition in the business of breeding, raising, exhibiting and selling Holstein cattle, a market in which many of the defendants also compete, by willfully depriving a competitor in the latter market of services essential to compete effectively.

Ignoring the doctrine of monopoly leveraging, defendants rely on *Official Airline Guides, Inc. v. Federal Trade Commission*, 630 F.2d 920, 927–28 (2d Cir.1980), *cert. denied*, 450 U.S. 917, 101 S.Ct. 1362, 67 L.Ed.2d 343 (1981), which held that the antitrust laws do not prevent a monopolist publisher of flight schedules not itself an air carrier from discriminating between classes of air carriers to the competitive disadvantage of one class. The publisher, "though possibly a monopolist in the airline schedule publishing industry, admittedly had no anticompetitive motive or intent with respect to the airline industry and is engaged in a different line of commerce from that of the air carriers." *Id.* at 926; see also *Beard v. Parkview Hosp.*, 912 F.2d 138, 144 (6th Cir.1990). In contrast, according to the amended complaint, in the present case many of the individual defen-

dants and much if not all of the membership of the defendant associations compete directly with the plaintiffs in the business of raising and marketing registered Holstein animals. *Official Airline Guides* itself expressly distinguished cases in which "the utilization of monopoly power in one market ... resulted in discrimination and the curtailment of competition in another market in which the monopolist himself was also engaged." *Id.* (distinguishing *LaPeyre v. FTC*, 366 F.2d 117 (5th Cir.1966)); see also *Soap Opera Now, Inc. v. Network Publishing Corp.*, 737 F.Supp. 1338, 1348 (S.D.N.Y.1990) (in a leveraging case under *Berkey Photo* plaintiff must demonstrate some "competitive advantage" gained by defendant in the second market).

This Circuit has explained the elements of monopoly leveraging under § 2 as follows:

> A successful claim of monopoly leveraging requires proof of at least three factors: monopoly power in one market, " 'the use of [that] power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor' " in another distinct market, and injury caused by the challenged conduct.

*Grand Light & Supply Co. v. Honeywell, Inc.*, 771 F.2d 672, 681 (2d Cir.1985) (quoting *Berkey Photo*, 603 F.2d at 275, and *United States v. Griffith*, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948)). The amended complaint adequately pleads these elements of a § 2 claim against the Vermont defendants and therefore survives a motion to dismiss.

This court concludes that counts 2 and 3 of the amended complaint properly state claims against the Vermont defendants under § 2 of the Sherman Act, and their motion to dismiss those counts is accordingly DENIED.

### B. THE EMPET/NEDHIA MOTION TO DISMISS

 The non-Vermont-based defendants, the NEDHIA and its general manager, Nelvin Empet, additionally argue in their motion that the complaint fails to make the necessary allegation in a § 1

claim that they entered into a "contract, combination ... or conspiracy" in restraint of trade with other defendants. See *Volvo North American Corp. v. Men's Int'l Professional Tennis Council*, 857 F.2d at 70 ("An agreement between two or more persons is fundamental to any § 1 claim."). Plaintiffs come closest to alleging this essential element in ¶ 63 of the amended complaint as follows:

> Defendant NEDHIA was initially willing to provide testing services, but later declined after its General Manager, Defendant Nelvin Empet, spoke to Defendant Albrecht. Defendant Albrecht told Defendant Empet that Plaintiff Donald Carleton was expelled because he had violated VDHIA rules although no rule violations had been alleged in the March 27 letter or formed the basis of the expulsion from the CDHIA or VDHIA.

This allegation is insufficient to state the joint action element of a § 1 claim. While the amended complaint suggests improper motives on Albrecht's part in communicating with Empet, it suggests nothing improper about the actions of Empet or the NEDHIA. Indeed, it appears to concede that NEDHIA declined to test Carleton's herd because Empet believed (albeit falsely) that Carleton was expelled for violating VDHIA rules. If Empet's actions, and the actions of the association he represented, proceeded upon the understanding, whether correct or not, that Carleton had transgressed VDHIA rules, then he cannot be held to have joined the conspiracy in restraint of trade alleged against those defendants who acted maliciously or with anticompetitive animus.

 This ruling may at first blush appear to be in tension with the law in this Circuit, as discussed above, that focuses on the *effects* of a defendant's conduct in a rule-of-reason case and that disapproves of the language in certain decisions suggest-

ing a "purpose-*or*-effect requirement." *United States Football League*, 842 F.2d at 1360 (emphasis in original). The court in *United States Football League*, for example, upheld a jury instruction that stated: "Examining the combination's purpose may assist you in determining the effects of the agreement on competition. The mere fact that the defendants had a good motive or sound purpose for entering into an agreement, however, does not in and of itself prevent you from finding that the agreement was an unreasonable restraint of trade." *Id.* It would follow, keeping this rule in mind, that the "good motive or sound purpose" of Empet and the NEDHIA (for no bad motive or unsound purpose is alleged) would not protect them from antitrust liability, *if* they had entered into an agreement that constituted an unreasonable restraint of trade. It is the holding of this court, however, that Empet and the NEDHIA did not, as far as is alleged in the amended complaint, enter into such an agreement. The complaint indeed alleges the existence of an agreement among and within certain associations to exclude the Carletons from fair competition in the Holstein market in derogation of the Sherman Act, and it further alleges that the NEDHIA and Empet took steps—a refusal to test the Carletons' herd—that would likely contribute to that agreement's anticompetitive effects; but it contains no allegation that the NEDHIA and Empet themselves were parties to such an agreement. They did not join a combination or conspiracy to do anything. They merely took legitimate action in response to information received from a sister organization.[5] See *Oreck Corp. v. Whirlpool Corp.*, 639 F.2d at 79 ("A mere showing of close relations or frequent meetings between the alleged conspirators ... will not sustain a plaintiff's burden absent evidence which would permit the inference that those close ties led to an illegal agreement.").

5. In contrast, an agreement among DHIAs or even the officers of a single DHIA to refuse to test the Carletons' herd because the Carletons had violated DHIA rules would satisfy the joint action element of a § 1 claim (although it would not, perhaps, survive a motion for summary judgment as failing in its proof of unreasonableness under the rule of reason). But that is not the agreement alleged in the complaint. The agreement alleged in the complaint is one to exclude and punish Donald Carleton for having challenged the competency and conduct of DHIA employees. See, e.g., ¶ 79. What is lacking is any allegation that the NEDHIA and Empet entered into *that* agreement.

Plaintiffs' § 2 claims against the NEDHIA and Empet are also infirm. Count 3, which purports to state a claim of conspiracy to monopolize, fails against these defendants for the same reasons that count 1 fails: NEDHIA and Empet are not part of the conspiracy that is alleged in the amended complaint. Count 2, which purports to state a claim of unlawful monopolization, fares no better. In *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966), the Supreme Court stated in oft-quoted language: "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." An actionable § 2 claim thus requires that the acts challenged be willfully undertaken to preserve or foster the defendants' monopoly or, in the case of leveraging, to foreclose or distort competition or destroy a competitor in another market. See *Grand Light & Supply Co. v. Honeywell, Inc.*, 771 F.2d at 681. The element of willfulness is wholly absent from the allegations in the amended complaint against the NEDHIA and Nelvin Empet.

Accordingly, the NEDHIA/Empet motion to dismiss is GRANTED.