34 F.3d 605
 1994-2 Trade Cases P 70,698
 Charles R. WILLMAN, M.D., Appellant,
v.
HEARTLAND HOSPITAL EAST; Heartland Hospital West;
Heartland Health System, Inc.; Richard Craig, M.D.; Ernest
Weinand, M.D.; Edward Beheler, M.D.; Edward Andres, M.D.;
James McMillen, M.D.; Robert Stuber, M.D.; Orlyn Lockard,
Jr., M.D.; Charles Mullican, M.D.; Wallace McDonald, M.D.;
Steven C. Krueger, M.D., Appellees.
 No. 93-3803.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 13, 1994.
Decided Aug. 29, 1994.
 
 David Harlan, St. Louis, MO and Julian Von Kalinowski, Culver City, CA, argued (David Streubel, St. Louis, MO, on the brief), for appellant.
 George E. Leonard, Kansas City, MO, argued (William Quirk and Lisa Eckold, Kansas City, MO, R. Dan Boulware and Mark Woodbury, St. Joseph, MO, on the brief), for appellees.
 Before RICHARD S. ARNOLD, Chief Judge, WOLLMAN, Circuit Judge, and WELLFORD,* Senior Circuit Judge.
 WOLLMAN, Circuit Judge.
 
 
 1
 Charles R. Willman, M.D. appeals from the district court's[1] grant of summary judgment in favor of the defendants, Heartland Hospital East, Heartland Hospital West, and various physicians[2] in an antitrust action arising from Willman's loss of medical staff privileges. We affirm.
 
 I.
 
 2
 Willman, a board-certified general surgeon, had medical staff privileges at Methodist Medical Center and St. Joseph Hospital, the two acute care hospitals in St. Joseph, Missouri. In 1983, the two hospitals affiliated under common ownership. In 1985, Methodist Medical Center became Heartland Hospital West and St. Joseph Hospital became Heartland Hospital East. In 1990, the two hospitals merged.
 
 
 3
 The events that eventually led to the revocation of Willman's privileges began on February 19, 1982, when Willman treated nineteen-year-old Bobby Fanning, who had been admitted to Methodist Medical Center for treatment of a gunshot wound to the chest. The head nurse of the Critical Care Unit as well as another nurse who had assisted in the treatment of Willman expressed concern to Drs. Stuber and Andres about Willman's treatment of Fanning. Because of the nurses' complaint, Methodist's administrator, Dr. Andres, and Dr. Beheler, a board-certified thoracic surgeon and Chairman of the Intensive Care Subcommittee of the Methodist Critical Care Committee, met to discuss Willman's treatment of Fanning. Dr. Andres decided to contact Dr. Stuber, the Chairman of the Critical Care Committee. Dr. Stuber convened a special meeting of the committee, which concluded that Willman had mismanaged Fanning's treatment. After numerous hearings before various medical staff committees, the Board of Trustees of Methodist Medical Center voted unanimously by secret ballot in favor of a motion stating in part that
 
 
 4
 the finding of the Medical Executive Committee, that Dr. Charles Willman's clinical care of Bobby J. Fanning ... was clearly different from that of his peers and potentially harmful, was supported by substantial evidence; it is further resolved that the action of the Medical Executive Committee in requiring that Dr. Charles Willman be required to obtain immediate consultation from a Board Certified general surgeon and/or thoracic surgeon on all cases of chest trauma requiring hospitalization and conducting a retrospective review of the Doctor's hospitalization cases for the year 1981 was warranted, appropriate and necessary.
 
 
 5
 After reviewing Willman's 1981 hospital admissions, the Quality Assurance Committee referred to the Medical Executive Committee eight of the fifty-three cases reviewed. Although the Medical Executive Committee concluded that four cases "did not reflect reasonable clinical judgment about serious clinical data" and cited five cases as examples of Willman's "consistent pattern of deficiency in completion of discharge summaries, history and physical, surgical reports, and progress notes," the committee voted to defer any action pending review of Willman's 1982 cases. The Quality Assurance Committee reviewed Willman's 1982 cases and determined that thirteen of the forty-one cases contained deficiencies. After considering the Quality Assurance Committee's report on the 1982 cases, the Medical Executive Committee adopted a proposal to reprimand Willman, discuss the findings of the Quality Assurance Committee with him, and conduct prospective periodic reviews of his hospital admissions. Willman, however, refused to discuss the proposal with the president of the medical staff. The Medical Executive Committee, therefore, unanimously voted, "based on medical evidence and in the interest of quality patient care," to suspend Willman's privileges. The Methodist Board of Trustees unanimously voted by secret ballot to affirm the committee's suspension of Willman's privileges. Pursuant to the board's instructions, the Medical Executive Committee re-reviewed with Willman the cases that the Quality Assurance Committee had forwarded to it. After this hearing, at which Willman was permitted to present evidence and call witnesses, the Medical Executive Committee determined that in eight of the seventeen reviewed cases Willman had provided substandard care. The committee therefore recommended, and the board agreed, that Willman's privileges should remain suspended.
 
 
 6
 In late 1983, Willman applied to have his medical staff privileges reinstated. Various committees of the medical staff considered the application and recommended denial because Willman had not submitted any evidence indicating that the deficiencies that led to the suspension of his privileges had been corrected. Article II, section three of Methodist's medical staff bylaws in effect in 1983 provided that "[t]he applicant shall provide adequate information for a proper evaluation of his application. If there is any doubt as to the competence, morals or ethics of the applicant, the burden shall be on him to resolve same." Willman requested and received a hearing before the Medical Executive Committee as well as before the Board of Trustees, following which both bodies voted to deny Willman's application for reinstatement. After a similar review process, Willman's June 1985 application for appointment to the medical staff of Methodist Medical Center (by then known as Heartland Hospital West) was also denied.
 
 
 7
 Because of Willman's treatment of Fanning, St. Joseph Hospital also reviewed Willman's staff privileges. In August 1982, the Executive Committee of the St. Joseph Board of Directors directed the medical staff to consider the chest trauma consultation requirement that had been placed on Willman at Methodist to determine if a similar requirement would be prudent at St. Joseph. After a series of committee meetings and hearings, the Executive Committee of the medical staff recommended that Willman be required "to obtain immediate consultation from a board-certified general surgeon and/or thoracic surgeon on all cases of chest trauma requiring hospitalization." The Board of Directors voted to adopt this recommendation.
 
 
 8
 In September 1982, the Chairman of the St. Joseph Board of Directors directed the medical staff to review Willman's cases to determine the appropriateness of his staff privileges. Dr. Weinand, the Chief of Staff and Chairman of the Medical Executive Committee, appointed a special subcommittee to review Willman's 1981 and 1982 cases. The subcommittee forwarded seventeen of the 1981 and 1982 cases to the Medical Executive Committee, which held hearings on May 31 and June 7, 1983. During the hearings, Willman indicated that he would not be willing to take steps to improve his surgical and medical knowledge. The committee then voted to revoke Willman's privileges at St. Joseph Hospital.
 
 
 9
 Willman then requested an ad hoc hearing. The ad hoc committee members voted to uphold the Medical Executive Committee's decision. Willman appealed to the Board of Directors, and the board appointed an Appellate Review Committee to review the decision. The committee, which consisted of one physician and two laypersons, found that the previous committees had been fair and impartial and that it would be in the best interests of patient care to affirm their decisions. The Board of Directors then voted unanimously by secret ballot to revoke Willman's medical staff privileges at St. Joseph Hospital.
 
 
 10
 In December 1983, the Circuit Court of Buchanan County, Missouri, ordered that Willman's privileges at St. Joseph Hospital be reinstated. Fourteen months later, however, the Missouri Court of Appeals reversed the Circuit Court's order, and Willman's privileges at St. Joseph were once again revoked. State ex rel. Willman v. St. Joseph Hosp., 684 S.W.2d 408 (Mo.Ct.App.1984). In June 1985, Willman applied for staff privileges at St. Joseph Hospital (by then known as Heartland Hospital East). Various committees reviewed the application and held hearings, but, as with his applications submitted at Methodist Medical Center, Willman failed to provide evidence of his current qualifications. On November 27, 1985, the Board of Directors upheld the recommendations of the reviewing committees and unanimously voted to deny Willman's application.
 
 
 11
 Willman then filed this action, which alleged that the defendants had violated sections one and two of the Sherman Act and had interfered without justification in his existing and prospective economic relationships with his patients in violation of state law. The defendant hospitals filed a counterclaim for abuse of process. The district court granted the defendants' motion for summary judgment on the Sherman Act claims and, declining to exercise pendent jurisdiction, dismissed without prejudice Willman's state-law claim and the counterclaim. Willman v. Heartland Hosp. East, 836 F.Supp. 1522 (W.D.Mo.1993).
 
 II.
 
 12
 We review a grant of summary judgment de novo. Grand Island Express v. Timpte Indus., Inc., 28 F.3d 73, 74 (8th Cir.1994). We must decide whether the record, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Id.
 
 A. Section One Allegations
 
 13
 To prove a violation of section one of the Sherman Act, 15 U.S.C. Sec. 1, a plaintiff must show an agreement in the form of a contract, combination, or conspiracy that imposes an unreasonable restraint on trade.
 
 
 14
 Unilateral actions of a single entity do not give rise to antitrust liability under section one of the Sherman Act. Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 769, 104 S.Ct. 2731, 2740-41, 81 L.Ed.2d 628 (1984). Section one of the Act applies only to concerted action. Fisher v. City of Berkeley, 475 U.S. 260, 266, 106 S.Ct. 1045, 1049, 89 L.Ed.2d 206 (1986); Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). Proof of concerted action requires evidence of a relationship between two or more legally distinct persons or entities. Copperweld Corp., 467 U.S. at 769, 104 S.Ct. at 2740-41. The defendants argue that for purposes of section one a hospital and its medical staff are not separate entities when a medical staff recommends denial or revocation of a physician's staff privileges.
 
 
 15
 We have not decided whether a hospital has the capacity to conspire with its medical staff. Flegel v. Christian Hosp., Northeast-Northwest, 4 F.3d 682, 685 n. 3 (8th Cir.1993). There is a split among the circuits that have considered the issue. Some courts hold that a hospital and its medical staff are not separate entities for purposes of section one because the medical staff acts as an agent of the hospital during the peer review process. See, e.g., Oksanen v. Page Memorial Hosp., 945 F.2d 696, 703 (4th Cir.1991) (en banc), cert. denied, --- U.S. ----, 112 S.Ct. 973, 117 L.Ed.2d 137 (1992); Weiss v. York Hosp., 745 F.2d 786, 817 (3d Cir.1984), cert. denied, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985). The Eleventh Circuit, on the other hand, has held that a hospital and the members of its medical staff are legally separate entities capable of conspiring with one another under the Sherman Act. Bolt v. Halifax Hosp. Medical Ctr., 851 F.2d 1273, 1280 (11th Cir.1988) (subsequent history omitted); cf. Oltz v. St. Peter's Community Hosp., 861 F.2d 1440, 1450 (9th Cir.1988) (holding that a hospital has the capacity to conspire with members of its medical staff, although not considering the issue in the context of peer review proceedings).
 
 
 16
 We need not decide whether a hospital can conspire with its medical staff, for even if we assume that the defendant hospitals had the capacity to conspire with their medical staffs, we conclude that Willman's section one claim fails. "Although revocation of a doctor's privileges may, perforce, eliminate competition by decreasing the number of doctors in a given specialty, this alone will not give rise to an antitrust violation." Johnson v. Nyack Hosp., 964 F.2d 116, 121 (2d Cir.1992). An essential element of a section one violation is proof of an unlawful objective. Monsanto Co., 465 U.S. at 768, 104 S.Ct. at 1473 (requiring proof of a "conscious commitment to a common scheme designed to achieve an unlawful objective"); American Tobacco Co. v. United States, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946) (stating that "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement" is sufficient). Monitoring the competence of physicians through peer review is clearly in the public interest, Lie v. St. Joseph Hosp., 964 F.2d 567, 570 (6th Cir.1992), and revocation of a physician's privileges because of legitimate concerns about the quality of patient care that he rendered is obviously a lawful objective. Willman contends, however, that the peer review proceedings were a "sham" and that his privileges were terminated to prevent him from competing with the defendants rather than because of concerns about substandard patient care.
 
 
 17
 We first consider Willman's argument that there is a genuine issue of fact concerning whether the peer review process was a sham. Specifically, Willman contends that the evidence "creates a genuine issue as to whether the peer reviewers reached the wrong result, and, as a consequence, removed a qualified physician." Based upon the record, we agree with Willman that whether he is a competent physician is in dispute. We do not agree, however, that this factual issue precludes summary judgment. An antitrust action is not the proper forum in which to evaluate a physician's competence. Oksanen, 945 F.2d at 711 ("[t]he antitrust laws were not intended to inhibit hospitals from promoting quality patient care through peer review nor were the laws intended as a vehicle for converting business tort claims into antitrust causes of action.").[3] Accordingly, whether Willman actually provided substandard care is not the proper question. Rather, we must decide whether Willman's peer reviewers could have reasonably concluded that he provided substandard care.
 
 
 18
 Although the record contains evidence from physicians to the effect that in their opinion Willman had provided acceptable care, we nevertheless conclude that it would not have been unreasonable for Willman's peer reviewers to have doubts about the quality of Willman's patient care. Physicians who were not affiliated with the hospital defendants and who did not practice in St. Joseph and therefore did not compete with Willman agreed that in some cases Willman had rendered care that was below the acceptable standard. For example, Dr. Ben McCallister, a board-certified internist and cardiologist, reviewed the charts of nine of Willman's patients and found that three of these patients had received substandard care. Dr. Paul Koontz, a board-certified general surgeon, reviewed eight of Willman's charts and found that Willman's care was deficient in four cases. Dr. Alfred Gervin, who is board certified in general surgery, critical care medicine, and emergency room medicine, concluded that in twenty-three of the thirty-four charts that he had reviewed, Willman had either violated the acceptable standard of care or had rendered "terrible care." Dr. Kenneth Mattox, a board-certified general surgeon and thoracic surgeon, reviewed only the Fanning case and concluded that Willman's "lack of understanding of the potential ramifications to the patient, coupled with his actual mismanagement and mistreatment of the patient, demonstrate a careless and reckless disregard for the patient." Indeed, one of Willman's medical experts concluded that "some of the cases, you know, represent outer edges of what we perceive as standard of care."
 
 
 19
 Corrective action against a physician does not violate the antitrust laws if the physician's peer reviewers had legitimate medical reasons to believe that the physician provided substandard care. Johnson, 964 F.2d at 121. On the other hand, a factfinder may infer the existence of an illegitimate motive if the peer group's conclusions are so baseless that no reasonable medical practitioner could have reached those conclusions after reviewing the same set of facts. Bolt v. Halifax Hosp. Medical Ctr., 891 F.2d 810, 821 (11th Cir.1990). "[A]ntitrust law limits the range of permissible inferences from ambiguous evidence in a Sec. 1 case." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Conduct that is as consistent with a lawful motive as with an unlawful motive, standing alone, does not support the inference of an antitrust conspiracy. Id.; see also Lovett v. General Motors Corp., 998 F.2d 575, 579 (8th Cir.1993). Although Willman submitted affidavits to the contrary, we conclude that the opinions of Drs. McCallister, Koontz, Gervin, and Mattox established that the peer group's conclusions were not so baseless as to permit the inference of improper motive. Accordingly, we conclude that the limitation and eventual termination of Willman's staff privileges, in light of the conflicting medical opinions regarding the acceptability of Willman's care, is as consistent with the lawful motive of promoting quality patient care as with an anticompetitive motive and therefore, without more, does not give rise to an inference of an antitrust conspiracy.
 
 
 20
 Willman contends, however, that the record contains additional evidence of an unlawful motive. He first argues that the participation of his competitors in the peer review process is evidence of such a motive. Although physicians whom Willman alleges were his competitors participated at every stage of the review process,[4] there is no evidence that the competitors acted in concert to pursue an unlawful motive. The record does indicate that Beheler, one of Willman's competitors, may have been biased against Willman. This evidence does not establish an anticompetitive motive among all of Willman's peer reviewers, however. Willman presented no evidence that any other competitors shared Beheler's sentiments, and Beheler submitted an affidavit stating that he never voted or participated in any deliberations concerning Willman's privileges to practice medicine at either Methodist or St. Joseph or their successors. Furthermore, Willman presented no evidence that Beheler or any other competitors attempted to unduly influence noncompetitor peer reviewers.
 
 
 21
 That the hospital boards and not the physicians whom Willman alleges were his competitors had authority to make the final decision concerning Willman's staff privileges further undermines Willman's theory of antitrust liability. Missouri law required that the hospital boards make the final decision. Mo.Code Regs. tit. 13, Sec. 50-20.021(2)(A)15. Each surviving board member who participated in the decisions regarding Willman's staff privileges submitted an affidavit confirming that the boards had made the final decisions concerning Willman's staff privileges and that no physicians had attempted to pressure, coerce, or lobby the board members to terminate Willman's privileges. The affidavits further stated that no physicians had threatened to boycott or retaliate against the hospitals if the boards did not accept the medical staffs' recommendation to terminate Willman's privileges. Willman submitted no evidence to dispute the affidavits.
 
 
 22
 In addition to arguing that the medical staffs conspired with the defendant hospitals, Willman contends that the members of the medical staffs conspired among themselves to eliminate him as a competitor. Regardless of whether a hospital has the capacity to conspire with members of its medical staff, the staff physicians can conspire among themselves, giving rise to section one liability. See, e.g., Oksanen, 945 F.2d at 706; Bolt, 891 F.2d at 819; Weiss, 745 F.2d at 814. That the members of the medical staff can conspire among themselves, standing alone, however, does not permit a reasonable jury to conclude that the physicians acted in concert in pursuit of an unlawful objective. As we have previously discussed, the physicians' actions during the peer review process are as consistent with the lawful purpose of promoting quality patient care as with the unlawful purpose of eliminating potential competitors. Willman's bare, unsupported allegations that his competitors acted in concert to insulate themselves from competition are not adequate responses to the defendants' summary judgment motion and supporting evidence. See Everett v. St. Ansgar Hosp., 974 F.2d 77, 80 (8th Cir.1992) (holding that summary judgment is proper when physician merely alleges that his peer reviewers acted in bad faith and malice). Accordingly, we conclude that the grant of summary judgment on Willman's section one claims was proper. See Nurse Midwifery Assocs. v. Hibbett, 918 F.2d 605, 617 (6th Cir.1990), cert. denied, --- U.S. ----, 112 S.Ct. 406, 116 L.Ed.2d 355 (1991).
 
 B. Section Two Allegations
 
 23
 In addition to his section one claim, Willman raised two claims alleging a violation of section two of the Sherman Act, 15 U.S.C. Sec. 2. Willman alleges that in terminating his staff privileges, the defendants denied him access to the hospitals' facilities, which are essential for him to compete. The essential facilities doctrine requires those in possession of facilities which cannot practically be duplicated to share those facilities with their competitors. City of Malden, Mo. v. Union Elec. Co., 887 F.2d 157, 160 (8th Cir.1989). To prevail under the essential facilities doctrine, the plaintiff must establish "(1) control of an essential facility by a monopolist; (2) the inability to practically or economically duplicate the facility; and (3) the unreasonable denial of the use of the facility to a competitor when such use is economically and technically feasible." Id.
 
 
 24
 The defendants argue that the essential facilities doctrine does not apply to a hospital's facilities in a staff privilege revocation case. We need not decide this question, however, for, as we have discussed above, the defendants' concerns about the care provided by Willman were legitimate. Terminating the staff privileges of a physician who may be rendering substandard care does not constitute an unreasonable denial of the use of the hospitals' facilities.
 
 
 25
 Willman also asserts a section two claim for monopoly leveraging. The elements of a monopoly-leveraging claim are (1) monopoly power in one market, (2) the use of that power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor in another distinct market, and (3) injury caused by the challenged conduct. Carleton v. Vermont Dairy Herd Improvement Ass'n, 782 F.Supp. 926 (D.Vt.1991). The defendants contend that the doctrine is not applicable in the present case and, alternatively, that monopoly leveraging is not an independent basis for liability under section two of the Sherman Act. Assuming that monopoly leveraging is a cognizable section two claim, we agree that Willman has failed to show that the doctrine is applicable. As we have already discussed, Willman did not present sufficient evidence to support his allegations that the defendants acted with an anticompetitive motive. Accordingly, he cannot satisfy the second element.
 
 C. Pendent Jurisdiction
 
 26
 Having disposed of all of the federal claims, the district court declined to exercise jurisdiction over the remaining state-law claim and the counterclaim. Willman argues that the district court should not have declined to exercise supplemental jurisdiction. The proper question, however, is whether the district court should have exercised pendent jurisdiction over the state-law claim and the counterclaim. The Judicial Improvements Act of 1990 codified the former common law doctrines of pendent and ancillary jurisdiction under the new rubric of supplemental jurisdiction. See 28 U.S.C. Sec. 1367. See also McLaurin v. Prater, 30 F.3d 982, 984-985 (8th Cir.1994). The Act applies to actions commenced on or after December 1, 1990. This action was commenced in 1989, so we review the district court's ruling on this issue under pre-Act case law.
 
 
 27
 "The decision to exercise pendent jurisdiction over state law claims is a matter of discretion for the district court." Hassett v. Lemay Bank & Trust Co., 851 F.2d 1127, 1130 (8th Cir.1988). In United Mine Workers v. Gibbs, the Supreme Court recognized that "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). Willman nevertheless contends that because the parties had completed a lengthy and complex discovery process and because the district court granted the defendants' motion for summary judgment less than two weeks before trial, the district court should have exercised jurisdiction over the state-law claims. Recognizing the district court's broad discretion in deciding whether to exercise pendent jurisdiction, we have upheld the refusal to exercise jurisdiction over a state-law claim even though the federal claims were disposed of late in the proceedings and the court had already devoted significant judicial resources to the state claim. Marshall v. Green Giant Co., 942 F.2d 539, 549 (8th Cir.1991). So also in this case, we hold that the district court did not abuse its discretion by declining to exercise jurisdiction over the state-law claim and counterclaim in this case, a decision that we note would have fallen within one of the exceptions to the exercise of supplemental jurisdiction contained in the 1990 Act. See 28 U.S.C. Sec. 1367(c)(3); McLaurin, 30 F.3d at ----.
 
 
 28
 The judgment is affirmed.
 
 
 29
 WELLFORD, Senior Circuit Judge, concurring.
 
 
 30
 I join in Judge Wollman's comprehensive opinion, except that I would join the Fourth Circuit (en banc) and the Third Circuit in concluding that for Sherman Act purposes, absent special circumstances not present in this case, "the peer review process does not represent the sudden joining of independent economic forces that section one [of the Sherman Act] is designed to deter and to penalize." Oksanen v. Page Memorial Hospital, 945 F.2d 696, 703 (4th Cir.1991) (en banc), cert. denied, --- U.S. ----, 112 S.Ct. 973, 117 L.Ed.2d 137 (1992). See also Weiss v. York Hospital, 745 F.2d 786, 814 (3d Cir.1984), cert. denied, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985). Accordingly, I would conclude that the medical staffs and review committees of the defendant hospitals, as a matter of law, cannot be held to conspire with the hospitals in conducting a good faith peer review of a staff member whose medical conduct is under investigation.
 
 
 
 *
 The Honorable Harry W. Wellford, Senior United States Circuit Judge for the Sixth Circuit, sitting by designation
 
 
 [1]
 The Honorable D. Brook Bartlett, United States District Judge for the Western District of Missouri
 
 
 [2]
 Willman named as defendants ten physicians who had staff privileges at one or both of the defendant hospitals. The defendant physicians are Andres, Beheler, Craig, and Weinand (general surgeons), Krueger, McDonald, McMillen, Mullican, and Stuber (internists), and Lockard (gastroenterologist)
 
 
 [3]
 Recognizing that the possibility of antitrust liability may impede effective peer review, Congress enacted the Health Care Quality Improvement Act of 1986. 42 U.S.C. Secs. 11101-11152. The Act immunizes medical peer review from antitrust liability if the challenged action is taken "in the reasonable belief that [it] was in the furtherance of quality health care." Id. Sec. 11112(a). We need not consider the impact of the Act on Willman's claims, for the Act was enacted after the events at issue in this case and is not retroactive
 
 
 [4]
 Approximately sixty-five physicians participated in the review and evaluation of Willman. Willman claims that forty-three of the reviewers were his competitors because they practiced in one or more of the areas in which Willman practiced: general surgery, urology, gynecology, gastroenterology, and internal medicine. We express no opinion on whether Willman has properly defined his competitors