William J. KERTH, M.D. and
E. Lawrence Hanson,
M.D., Plaintiffs,

v.

HAMOT HEALTH FOUNDATION,
et al., Defendants.

Civil Action No. 95–212.

United States District Court,
W.D. Pennsylvania.

Sept. 30, 1997.

Mark L. Rosenberg, Alan A.B. McDowell, Jacobovitz Law Firm, Washington, DC, Arthur N. Lerner, Michaels, Wishner & Bonner, Washington, DC, Jeffrey S. Jacobovitz, Michaels, Wishner & Bonner, Washington, DC, for William J. Kerth, M.D., E. Lawrence Hanson, M.D.

James R. Walczak, W. Patrick Delaney, Craig R.F. Murphey, Eric J. Purchase, Gerald J. Stubenhofer, MacDonald, Illig, Jones & Britton, Erie, PA, for Hamot Health Foundation, Inc., the Hamot Medical Center, of the City of Erie, Pennsylvania.

David Marx, Jr., Brent R. Austin, McDermott, Will & Emery, Chicago, IL, for George J. D'Angelo, M.D., George F. Kish, M.D., Dennis J. Michalak, M.D., Prabhaker G. Sardesai, M.D., Wilfredo S. Tan, M.D., George J. D'Angelo, M.D., Thoracic and Cardiovascular Associates, P.C., and Thoracic and Cardiovascular Associates, Inc. dba D'Angelo Clinic.

S.E. Riley, Jr., Conner & Riley, Erie, PA, Jack R. Bierig, Richard D. Raskin, Bruce M. Zessar, Sidley & Austin, Chicago, IL, for Medicor Associates, Inc.

Eric J. Purchase, MacDonald, Illig, Jones & Britton, Erie, PA, for Hamot Health Systems, Inc.

Shirley J. Christian, Harrington & Mitchell, Youngstown, OH, for Western Reserve Care System, an Ohio Not–For–Profit Corporation.

Barbara Blackmond, Horty, Springer & Mattern, Pittsburgh, PA, for Columbia Mercy Medical Center.

Linda R. Mittleman, Cleveland, OH, for University Hospitals of Cleveland.

Edward R. Ehrhardt, Jr., Pittsburgh, PA, for Shadyside Hospital.

## MEMORANDUM OPINION AND ORDER

McLAUGHLIN, District Judge.

This antitrust case involves alleged restraint of trade in the practice of open heart surgery in Erie, Pennsylvania. Plaintiffs are two cardiovascular surgeons who have sued (1) the hospital at which they used to work, (2) a group of cardiologists who used to refer cases to them and (3) a competing group of cardiovascular surgeons. Plaintiffs claim the competing surgeons coerced the hospital and the cardiologists into conspiring to destroy their practice by denying them referrals. Plaintiffs' six count complaint alleges violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, as well as state law claims for antitrust violations and tortious interference with prospective business relations.

Presently before the Court are motions for summary judgment filed on behalf of the following Defendants:

1. The D'Angelo Clinic, George J. D'Angelo, M.D., George F. Kish, M.D., Prabhaker G. Sardesai, M.D. and Wilfredo S. Tan, M.D. [Doc. No. 116].

2. Medicor Associates, Inc. [Doc. No. 124].

3. Hamot Health Foundation and Hamot Medical Center of the City of Erie, Pennsylvania [Doc. No. 137].

We have consolidated these motions for purposes of this Memorandum Opinion and Order. For the reasons set forth below, Defendants' motions for summary judgment will be granted.

## I. BACKGROUND

Cardiovascular surgeons derive the majority of their open heart surgery cases through referrals. The typical referral pattern for a heart patient is from a primary care physician to a cardiologist and then, if the patient needs surgery, to a cardiovascular surgeon. Obviously, the surgery is performed in a hospital that has the appropriate facilities. Thus, to succeed in the business, a cardiovascular surgeon needs surgical privileges at a hospital and a stable source of referrals.

*The Parties*

The Defendants in this case are: (1) Hamot Health Foundation and Hamot Medical Center of the City of Erie, Pennsylvania (collectively "Hamot"); (2) Medicor Associates, Inc. ("Medicor"); and (3) the D'Angelo Clinic and various of its individually named employees (collectively the "Clinic" or the "Clinic Defendants").

Hamot is a 480–bed hospital in Erie that provides a wide range of inpatient services including open heart surgery.[1] Hamot has a three-part organizational structure consisting of (1) a Board of Directors, (2) an Administrative Staff and (3) a Medical Staff. The Board has ultimate authority over the operation of the hospital, including establishment of hospital policy and the credentialling of physicians. The Administrative Staff has been delegated responsibility for the day-to-day operation of the hospital. The Medical Staff consists of physicians who have been granted privileges to practice at Hamot.

Medicor is group of cardiologists and internists that have practiced at Hamot since 1973. Currently, Medicor employs eleven cardiologists and three internists. The Medicor cardiologists receive the majority of their heart patients through referrals from other practitioners. Medicor has never employed cardiovascular surgeons and does not compete in the practice of open heart surgery. When a Medicor heart patient requires surgery, that patient is always referred to a cardiovascular surgeon. Medicor is the dominant cardiology group[2] at Hamot and serves as the primary source of referrals for open heart surgeries performed at Hamot.

The Clinic and its individually named employees are a group of cardiovascular surgeons that competed with the Plaintiffs at Hamot. The Clinic Defendants still practice at Hamot. The Clinic was founded in the 1960s by Dr. George D'Angelo.[3] Dr. D'Angelo is a well known and respected figure in the Erie medical community. Dr. D'Angelo performed the first open heart surgery in Erie in 1962; and also performed the first coronary bypass and valve replacement surgeries in Erie. Currently, the Clinic consists of four active cardiovascular surgeons who perform over 600 open heart surgeries at Hamot annually.

The Plaintiffs are E. Lawrence Hanson, M.D. ("Dr. Hanson") and William J. Kerth, M.D. ("Dr. Kerth"). Drs. Hanson and Kerth are cardiovascular surgeons who lost their open heart surgery privileges at Hamot in 1992 and 1993 respectively because they failed to perform enough open heart surgeries to meet Hamot's minimum surgical volume requirement.[4] Plaintiffs then filed the instant antitrust action, claiming their lack of surgeries was the result of a conspiracy to destroy their practice by depriving them of referrals.

*Open Heart Surgery at Hamot*

At Hamot, as at many other hospitals, neither the cardiologists nor the cardiovascular surgeons are Hamot employees. Rather, they are independent specialists who have been granted privileges to practice their specialty at the hospital.[5] Hamot does, however,

---

1. The only other hospital in Erie at which open heart surgery is performed is St. Vincent's Medical Center.

2. Plaintiffs allege Medicor had an "exclusive franchise" to provide cardiology services at Hamot as part of the "Hamot Centered Physicians Program" ("HCPP"). This allegation is unsupported by the record. The record shows that while Hamot has entered into exclusive arrangements with other specialists (Albert Dep at 35), it had never done so with Medicor. Other cardiologist have provided services at Hamot (Sharma Aff. ¶ 7; Feraro Aff. ¶ 4; Zone Aff. ¶ 8; Furr Aff. ¶ 5; Furr Dep. 25–26) and Medicor cardiologist maintain privileges at other hospitals (Zone Aff. ¶ 7).

3. The Clinic was originally founded in the early 1960s. In 1980, it became a professional corporation called Thoracic and Cardiovascular Associates, P.C., but continues to do business as "The D'Angelo Clinic."

4. The requirement is discussed in more detail below.

5. Hamot also encourages certain specialists to confine their practice exclusively to Hamot. It also has entered into exclusive dealing agreements with some specialists under which it has agreed not to grant privileges to competing specialists. (See Albert Dep at 35.) These arrangements are discussed in more detail below.

set staffing policies and regulates the practice of specialties, including cardiovascular surgery.

For example, in 1983 Hamot placed a moratorium on granting new cardiovascular surgical privileges. The moratorium, however, was not inflexible. At various times, Hamot's Board lifted the moratorium to permit the recruitment of new cardiovascular surgeons. As discussed in more detail below, Dr. Hanson was the beneficiary of such action on several occasions.

Additionally, in August 1983, Hamot's Board authorized the formation of a committee to investigate issues relating to cardiovascular surgery at the hospital. As a result of the committee's work, in April 1984 the Board adopted a number of rules regulating cardiovascular surgery. The Board passed a "First Surgical Assistant Rule" ("FSAR"). Under the FSAR, two board certified cardiovascular surgeons were required to participate in every open heart surgery, one as the primary surgeon and the other as a first assistant. The stated purpose of the FSAR was to ensure the presence of two qualified surgeons during every procedure. This rule was in effect during the events giving rise to this case but was later abandoned when it came under criticism for, among other things, an inefficient use of surgeons' time.

The Board also established an open heart surgery volume requirement. Under the volume requirement, cardiac surgeons were required to perform at least one hundred open heart surgeries per year, twenty-five of which must be as the primary surgeon, in order to maintain their privileges. The stated purpose of the volume requirement was to ensure that surgeons participated in enough procedures to maintain their technical proficiency. The rule was supported by contemporary studies linking volume and lower mortality rates. *See Pontius v. Children's Hospital*, 552 F.Supp. 1352 (W.D.Pa.1982).

In October 1986, Hamot instituted its "Hamot–Centered Physicians Program" ("HCPP"). The stated purpose of the HCPP was to promote quality and uniformity of care. Under the program, physicians were offered various benefits in exchange for focusing their practice at Hamot. (Plaintiffs' Appendix of Exhibits (hereinafter "Pls.' Ex.") 2 at pp. 7–8). According to the program's "principles of agreement," these benefits included investment opportunities, practice management support, discount malpractice insurance and consideration of a "franchise" agreement whereby Hamot agrees not to grant privileges to competing physicians.[6] (Id.)

*The History of Plaintiffs' Practice at Hamot*

Dr. Hanson began performing open heart surgeries at Hamot with his partner, Dr. Bruce Farrell, in 1982 after having practiced at St. Vincent Medical Center in Erie since 1971. At that time, the Clinic was the only cardiovascular surgery group at Hamot. According to Dr. Hanson, he joined Hamot's staff because two Medicor cardiologists, Dr. Charles Furr and Dr. Donald Zone, had expressed concern over the Clinic's mortality rate and wanted an alternative group of cardiovascular surgeons to whom to refer their patients.

Drs. Hanson and Farrell quickly established a successful practice at Hamot. Their group routinely received referrals from several Medicor cardiologists and their practice grew. In 1982, Drs. Hanson and Farrell performed 50 open heart surgeries at Hamot. In 1983 they performed 96 open heart surgeries. In 1984, Hamot lifted its moratorium on credentialling new cardiovascular surgeons so that Drs. Hanson and Farrell could recruit a third surgeon, Dr. Richard Cunningham, to join their practice. With the addition of Dr. Cunningham, the team's practice continued to grow. In 1984, the group performed 123 open heart surgeries at Hamot.

Dr. Hanson's group was reduced to two surgeons in early 1985 when Dr. Farrell died. The group's volume declined. In 1985 and 1986, the group performed 112 and 101 open heart surgeries respectively. In 1987, Hamot again lifted its moratorium on granting

---

**6.** Hamot reserved the right to void any such "franchise" agreement and recruit additional physicians if the need arose. (Id.)

new cardiovascular privileges so that Drs. Hanson and Cunningham could recruit Dr. John Forman. Dr. Forman joined the team in late 1987.[7] In 1988, the group's volume increased to 119 open heart surgeries.

However, despite Dr. Hanson's group's collective volume, Dr. Hanson individually was not meeting Hamot's volume requirement.[8] On December 12, 1988, Hamot notified Dr. Hanson of its concern about his ability to satisfy the criteria and that his future activity would be scrutinized.

The following year marked the beginning of a precipitous decline in the number of open heart surgeries performed by Dr. Hanson's group at Hamot. Drs. Cunningham and Forman resigned and left Erie, leaving Dr. Hanson alone in practice. Dr. Hanson's practice suffered because he was left without a partner who could provide consistent assistance. In response, Hamot again lifted its moratorium on granting new cardiovascular surgical privileges so that Dr. Hanson could recruit a new partner. Dr. Hanson first recruited Dr. Thomas Comer. For a variety of reasons, Dr. Comer did not fare well at Hamot and left after only four months. Dr. Hanson then recruited Dr. Kerth.

Dr. Kerth had started his career at Pacific Medical Center ("PMC") in San Francisco, where he practiced from 1962 to 1980. Dr. Kerth stated that while at PMC he performed over 100 surgeries per year and had published over ninety papers on open heart surgery. In 1980, Dr. Kerth left the United States to practice at King Faisal Specialist Hospital in Saudi Arabia. He did not perform any open heart surgeries while in Saudi Arabia. In 1983, Dr. Kerth returned to the United States and unsuccessfully tried to obtain privileges in Nebraska and at PMC. Ultimately, in late 1987, Dr. Kerth obtained limited privileges at Phoenix Baptist, Scottsdale Memorial and Good Samaritan hospitals in Arizona as part of a fellowship in cardio-

vascular surgery where he underwent retraining in open heart surgery. He worked in Arizona until contacted by Dr. Hanson.

After he was contacted by Dr. Hanson, Dr. Kerth visited Erie. He met with the Medicor cardiologists as part of his trip to Erie. According to Dr. Kerth, with the exception of Drs. Underhill and Sharma who told him they referred only to the Clinic, each Medicor cardiologists with whom he met was positive about his arrival at Hamot and created the expectation he would receive substantial referrals. (Kerth Dep. 125, 137, 475.) The arrival of Dr. Kerth in late 1989, however, did not increase the number of referrals to Dr. Hanson's group.

In December 1989, Hamot again notified Dr. Hanson of its concern about his continuing failure to meet the volume requirement.[9] Instead of terminating Dr. Hanson's privileges, Hamot informed Dr. Hanson he would need to perform at least 50 open heart surgeries in the first six months of 1990 or his privileges would lapse. Dr. Hanson did not receive enough referrals to meet this requirement and his privileges were terminated in July 1990.[10] The termination of Dr. Hanson's privileges left Dr. Kerth without a partner and his open heart surgery practice ground to a virtual halt.

In January 1991, at the request of Dr. Hanson and Dr. James Pepicello, Hamot's then Chief of Surgery, Hamot's Board replaced the volume requirement with a quality assurance program. The Board then reinstated Dr. Hanson's privileges, subject to the new criteria. While this arrangement enabled Dr. Hanson to begin operating again, it did not resolve the underlying lack of referrals to his group. In fact, throughout 1991 the number of referrals to Dr. Hanson's group further declined. In 1991, Drs. Hanson and Kerth performed only 13 open heart surgeries at Hamot.

7. Dr. Hanson's group performed 97 open heart surgeries at Hamot in 1987.

8. In 1988, Dr. Hanson was the primary surgeon in 42 open heart surgeries and assisted in 37.

9. Dr. Hanson performed 33 open heart surgeries at Hamot in 1989.

10. Dr. Hanson's group performed 34 surgeries in 1990. It appears that most of these cases were referred to Plaintiffs from sources other than Medicor.

In mid 1992, Hamot notified Drs. Hanson and Kerth that their surgery volume had become so low that it was no longer possible to conduct a statistically meaningful evaluation of the quality of care they were providing. The Board voted to reinstate the volume requirement. Dr. Hanson's privileges were revoked in mid 1992. Dr. Kerth's privileges were revoked in the following year.[11]

The instant civil action followed. Plaintiffs filed a six count complaint on August 11, 1995.[12] In Counts I, II and III, Plaintiffs allege the Defendants violated section 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to (1) boycott, (2) reciprocally deal and (3) exclusively deal in open heart surgery referrals. In Count IV, Plaintiffs claim the Clinic Defendants violated section 2 of the Sherman Act, 15 U.S.C. § 2, by attempting to monopolize the market for open heart surgery in Erie. In Counts V and VI, Plaintiffs allege pendant state law antitrust and tortious interference with prospective business relations claims based on the same conduct allegedly giving rise to the Sherman Act violations.

## II. STANDARD OF REVIEW

A movant is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). This rule allows parties to demonstrate prior to trial that opposing claims "have no factual basis." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The inquiry here is "whether there is any need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party has the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex*, 477 U.S. at 323. Thereafter, the burden shifts to the non-moving party to demonstrate that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324. All inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

## III. DISCUSSION

### 1. The Section 1 Claims

Counts I, II and III of Plaintiffs' complaint are premised on section 1 of the Sherman Act which provides:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1.

"To establish a section 1 violation, a plaintiff must prove: (1) concerted action by the defendants; (2) that produced anticompetitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action." *Mathews v. Lancaster General Hosp.*, 87 F.3d 624, 639 (3d Cir.1996) (*citing Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.*, 998 F.2d 1224, 1229 (3d Cir.1993), *cert. denied sub nom.*, *Moyer Packing Co. v. Petruzzi's IGA Supermarkets, Inc.*, 510 U.S. 994, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993)). We have bifurcated discovery on the "concerted action" and "relevant market" elements. Thus, at this point, we are only concerned with proof of whether the

---

**11.** Hamot initially revoked Dr. Kerth's privileges in 1992, but retreated from its position and reinstated Dr. Kerth's privileges because newly credentialed surgeons received a three year grace period in which to begin meeting the volume requirement.

**12.** An amended complaint was effectively filed on March 3, 1997 when this Court granted Plaintiffs' motion for leave to file an amended complaint.

Defendants participated in any illegal concerted action.

 "Concerted action" is a "collective reference to the contract combination or conspiracy." *Mathews,* 87 F.3d at 639 (*citing Siegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125, 1131 (3d Cir.1995)). It requires "a unity of purpose or a common design and understanding or meeting of the minds in an unlawful arrangement." *Id.* (citations omitted) "Unilateral action, no matter what its motivation, cannot violate [section] 1." *Id.* (*citing Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 110 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981)). A plaintiff's evidence must tend to exclude the possibility that the defendants were acting independently. *Monsato Co. v. Spray Rite Service Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984).

 Additionally, a plaintiff's theory of concerted action must be economically plausible. "[I]f the [plaintiff's] claim is one that simply makes no economic sense [the plaintiff] must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary." *Matsushita Elec. Industrial Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In such an instance, an inference of concerted action is not reasonable unless the plaintiff's evidence is "sufficiently unambiguous to permit a trier of fact to find that (the defendants) conspired ... despite the absence of any apparent motive to do so." *Matsushita,* 475 U.S. at 597.

*Plaintiffs' Conspiracy Theory*

Plaintiffs claim the conspiracy in this case was born of the Clinic's anticompetitive goal of becoming the exclusive provider of cardiovascular surgery at Hamot. To achieve its goal, the Clinic allegedly economically coerced Medicor and Hamot into participating in a scheme designed to destroy Plaintiffs' practice by depriving them of referrals. Medicor's role in the conspiracy was to refer exclusively to the Clinic. Hamot's role in the conspiracy was (1) to use its economic influence over Medicor to ensure that Medicor faithfully referred only to the Clinic, and (2) to ensure the success of the conspiracy by creating an atmosphere at Hamot in which Medicor's failure to refer cases to Plaintiffs would ultimately drive Plaintiffs out of business.[13] Notably, however, the allegations of wrongdoing levied against Hamot do not extend to Hamot's revocation of Plaintiffs' privileges. Plaintiffs have explicitly stated that they

> do not challenge any particular professional review action relating to their loss of privileges. Rather, they challenge the anti-competitive activities that led to the destruction of Dr. Hanson's medical practice and that led to the inability of Dr. Kerth to establish a viable practice in Erie.

(Amended Complaint at ¶ 54.)[14]

According to Plaintiffs, the first overt act in furtherance of the alleged conspiracy was a December 1989 Physicians' Staffing Committee meeting, held one day after Dr. Kerth's arrival at Hamot, in which one of the items on the agenda was a discussion of whether Hamot really "need[s] one or two groups of CV [cardiovascular] Surgeons." (Oral Arg. Tr. at 78–79; Pls.' Ex. 9).

Defendants raise a two-part argument in support of their motions for summary judgment on the section 1 counts:[15] (1) that

---

13. In this respect, Hamot is accused of facilitating the conspiracy. The Third Circuit has held that "those who, with knowledge of the conspiracy, aid or assist in carrying out the purposes of the conspiracy" are equally as liable as the original conspirators. *Nanavati,* 857 F.2d at 119 (internal citations omitted).

14. Presumably, Plaintiffs have taken this position because professional peer review actions are entitled to qualified immunity under the Health Care Quality Improvement Act, HCQIA, 42 U.S.C. §§ 11101 et seq. *Mathews,* 87 F.3d at 634–35.

15. Hamot also re-raises the arguments that: (1) it could not have conspired as a matter of law under *Weiss v. York Hospital,* 745 F.2d 786, 814–815 (3d Cir.1984), *cert. denied,* 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985) and *Nanavati v. Burdette Tomlin Memorial Hospital,* 857 F.2d 96, 119 (3d Cir.1988), *cert. denied,* 489 U.S. 1078, 109 S.Ct. 1528, 103 L.Ed.2d 834 (1989); and (2) it is immune from damages under the HCQIA, 42 U.S.C. §§ 11101 et seq. In ruling on

Plaintiffs' theory of the conspiracy is implausible because neither Hamot nor Medicor had a rational motive to join in such a conspiracy and (2) that the Plaintiffs have not produced evidence excluding the possibility that the Medicor cardiologists made referral decisions based on independent medical judgment. Before addressing this argument, we again emphasize that our inquiry is framed by the nature of the alleged conspiracy in this case, which is an agreement to deprive the Plaintiffs of referrals. The source of those referrals are the Medicor cardiologists. The Medicor cardiologists had only two referral options at Hamot for open heart surgery—the Plaintiffs or the Clinic. Thus, our focus is properly on whether there is a material issue of fact concerning whether the Medicor cardiologists were not referring to Plaintiffs because of a reciprocal or exclusive referral agreement that was foisted upon them by coercive pressure from the Clinic and/or Hamot. As discussed below, the existence of such an agreement is not only economically implausible, it is also unsupported by the record.

**A. Economic Motive**

Defendants argue the putative conspiracy is unreasonable under the holding of *Matsushita, supra*, because Plaintiffs have not presented a coherent explanation of what either Hamot or Medicor stood to gain by helping the Clinic destroy Plaintiffs' practice.[16] In *Matsushita*, American makers of television sets alleged that Japanese electronics manufacturers had conspired to drive them out of business by fixing prices below market levels and that they had financed this strategy with monopoly profits earned in the Japanese market. *Matsushita*, 475 U.S. at 578. The district court granted summary judgment in favor of the defendants. *Id.* at 579. The

Third Circuit reversed the district court and the defendants appealed.

On appeal, the Supreme Court concluded that the Third Circuit had not adequately addressed whether the defendants had a plausible motive to engage in the alleged conspiracy. In reaching this conclusion, the Supreme Court first pointed out that predatory pricing conspiracies are speculative, rarely tried and even more rarely successful because they require the conspirators to forgo profits in hopes of recouping their losses after the conspiracy is successful. *Id.* at 588–89. Next, the Court observed that the alleged conspiracy was twenty years old and still far from achieving its alleged goal. *Id.* at 591. Third, the Court looked at the market and determined there was no evidence that the defendants, even if successful, could realistically hope to recoup the losses they had suffered pursuing their alleged goal.[17] *Id.* Thus, the Court concluded that the record, if anything, suggested the defendants "had every incentive not to engage in the conduct with which they [were] charged." *Id.* at 595.

The Court went on to hold that the defendants' lack of an economically plausible motive to enter into the alleged conspiracy limited the range of inferences that could be drawn in favor of the plaintiffs because allowing mistaken inferences from ambiguous evidence would chill legitimate procompetitive behavior. *Id.* The Court also observed that much of the evidence of "concerted action" in the case was ambiguous and equally as consistent with a legitimate procompetitive motive as it was with an anticompetitive one. *Id.* at 596–97. Thus, the Supreme Court remanded the case to the Third Circuit for consideration of whether the plaintiffs had produced "sufficiently unambiguous" evidence that the defendants conspired "despite

Hamot's motion to dismiss, this Court has already rejected these arguments because Plaintiffs have disclaimed any challenge to professional peer review actions.

**16.** As a competitor, the Clinic's motive is apparent on its face. However, the nature of Plaintiffs' section 1 claims are such that, if Medicor and Hamot become entitled to summary judgment, so does the Clinic. Without the participation of

Medicor and Hamot, the Clinic could have no control over referrals and could not destroy Plaintiffs' practice.

**17.** A believable theory of predatory pricing, therefore, must take into account how the conspirators, if successful, expect to recover more long term monopoly profits than they will sustain short term losses. *Id.*, 475 U.S. at 589, 106 S.Ct. at 1357.

the absence of any apparent motive to do so." *Id.* at 597–98.

The application of *Matsushita* to motions for summary judgment was addressed by the Third Circuit in *Petruzzi's IGA v. Darling–Delaware,* 998 F.2d 1224 (3d Cir.1993). The Third Circuit, focusing on the attendant concerns raised by the *Matsushita* Court, observed that Matsushita did not create a new summary judgment standard in section 1 Sherman Act cases, but rather limited the permissible scope of liberal inferences which could be drawn from ambiguous evidence when: (1) the plaintiff's conspiracy theory was economically implausible and (2) permitting an inference of antitrust conspiracy under the circumstances would have the effect of deterring significant procompetitive conduct. *Petruzzi's IGA,* 998 F.2d at 1232. The Third Circuit further pointed out that the "*Matsushita* Court did not hold that an antitrust defendant is entitled to summary judgment merely by providing an economic theory to justify its behavior." *Id.* at 1231. *See, also, Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 468, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). Thus, when *Matsushita* applies, the proper inquiry is not whether a defendant can plausibly explain its behavior, but rather whether there is sufficient evidence that reasonably supports the inference that a defendant acted contrary to rational economic self interest.

### Hamot's Alleged Motive

Hamot argues that Plaintiffs have not presented a plausible explanation of its economic motive to join the alleged conspiracy. Hamot points out that it did not compete with Plaintiffs because it did not employ cardiovascular surgeons. Quite to the contrary, Hamot argues it derived revenue from surgeries performed by the Plaintiffs and that, consistent with this interest, it repeatedly granted Dr. Hanson exceptions to its credentialling moratorium and its volume requirement in order to permit him to revive his practice; and that it took adverse action only after Dr. Hanson's group's surgical volume had become so low that Hamot could no longer meaningfully evaluate the quality of care his group was providing.

Plaintiffs argue the instant situation is analogous to number of cases in which a hospital conspired against physicians who practiced at the hospital. *See Jefferson Parish Hospital Dist. No. 2 v. Hyde,* 466 U.S. 2, 5, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1983) (anesthesiologist was denied privileges because the hospital had already entered into an express exclusive contract with his competitors); *Betkerur v. Aultman Hosp. Ass'n.,* 78 F.3d 1079, 1083 (6th Cir.1996) (hospital dissolved a "Cross–Coverage" policy under which OB/GYNs were required to refer to the Neonatologist "on-call" at the time, freeing physicians to engage in exclusionary referral practices directed at the plaintiff); *Key Enterprises of Delaware, Inc. v. Venice Hospital,* 919 F.2d 1550, 1554 (11th Cir.1990) (hospital instituted an official policy of referring patients to a particular vendor of durable medical equipment with whom the hospital had entered into a joint venture), *cert. denied sub nom., Sammett Corp. v. Key Enterprises of Delaware, Inc.,* 511 U.S. 1126, 114 S.Ct. 2132, 128 L.Ed.2d 863 (1994).

These cases are not analogous to the situation presented here. *Jefferson Parish Hospital and Key Enterprises of Delaware* involved express agreements between the hospital and the plaintiffs' competitors which provided an obvious economic incentive for the hospital to exclude the plaintiffs from the market. The unique facts in *Betkerur* empowered the hospital to exercise direct control over referral patterns. Here, Plaintiffs have not produced an express exclusive agreement between Hamot and the Clinic. Nor have they produced any evidence that Hamot had direct control over Medicor's referral patterns. Rather, Plaintiffs theory is that Hamot was covertly pressuring Medicor to refer exclusively to the Clinic because Dr. D'Angelo was threatening to move his large income generating practice to another hospital if the Clinic was not made the exclusive provider of cardiovascular surgery at Hamot. According to Plaintiffs, Dr. D'Angelo's threats put Hamot in an "catch 22" situation, forcing it to join the conspiracy and sacrifice the relatively small amount of revenue generated by the Plaintiffs in order to ensure it maintained a stable relationship with the Clinic. Plaintiffs contend that Ha-

mot capitulated to Dr. D'Angelo's threats and took the official position that it would be easier for the hospital to market and control one cardiovascular surgery group rather than two.

■ In this respect, Plaintiffs reliance on *Boczar v. Manatee Hospitals & Health Systems, Inc.*, 993 F.2d 1514, 1519 (11th Cir. 1993) and *Oltz v. St. Peter's Community Hospital*, 656 F.Supp. 760, 762–764 (D.Mont. 1987), *aff'd*, 861 F.2d 1440 (9th Cir.1988) is more appropriate. These cases stand for the principal that physicians' threats to leave a hospital can provide the hospital with an economic motive to conspire against the physicians' competitors. Notwithstanding the merits of this economic theory, it does not apply here because Plaintiffs have produced no evidence from which it could reasonably be inferred that Hamot's actions were motivated by such concerns.

The evidence cited by Plaintiffs consists of: (1) evidence that Dr. D'Angelo wanted the Clinic to be the exclusive provider of cardiovascular surgery at Hamot,[18] (2) evidence that Dr. D'Angelo was popular, regarded as influential and generated significant revenue for Hamot, (3) testimony that Dr. D'Angelo had, on several occasions, threatened to move patients from Hamot over quality of care issues,[19] and (4) the fact that one of the items on the agenda for the December 1989 Physicians Staffing Committee meeting was a discussion of whether Hamot "need[s] one or two groups of [cardiovascular] surgeons."[20]

There is no evidence reasonably supporting the inference of a causal connection between Dr. D'Angelo's desire to have "exclusive" status at Hamot and Hamot's consideration of its cardiovascular surgery staffing needs. There is simply no evidence that Dr. D'Angelo actually threatened to move the Clinic if the Clinic was not granted exclusive status. There is no evidence that a Board member or a member of Hamot's Administrative Staff feared such a move. Moreover, it would be wholly speculative to infer that such undocumented threats motivated Hamot to take action based on the fact that Dr. D'Angelo was influential, popular or generated money, or from the fact that Dr. D'Angelo may have threatened to move patients over collateral issues.

Alternatively, Plaintiffs suggest Hamot had a motive to destroy their practice because it perceived Dr. Hanson as a threat to the success of a collateral conspiracy to block the entry of managed care, which paid lower fees for hospital services, into the health care market in Erie. In support of this contention, Plaintiffs claim Hamot was a participant in a collateral conspiracy (along with other hospitals and physicians in Erie) to boycott health maintenance organizations ("HMOs"). According to Plaintiffs, Dr. Hanson was a maverick who threatened the success of this boycott by maintaining privileges at two hospitals. Supposedly, Dr. Hanson's dual privileges would make it possible for HMOs to get Hamot and St. Vincent's to bid against one another for surgical facilities without requiring patients to change their cardiovascular surgeon.

Plaintiffs' collateral conspiracy theory is also not supported by the record. The evidence of this collateral conspiracy consists of an affidavit from Geraldine Zurn, the former president of Independent Health ("IH"), an HMO in Buffalo, New York and a draft of Hamot's Physician Staffing Plan. Ms. Zurn states that IH was not able to establish itself in Erie because it could not succeed in recruiting specialists. The plan draft, which Plaintiffs characterize as a "remarkable document," discusses increased competition in the health care industry due to "excess capacity" and indicates Hamot should work with its staff to remain competitive by controlling the supply of physicians and encouraging physicians to practice exclusively at

---

**18.** Dr. Kish testified that the desire to have exclusive status was a "common theme" at the Clinic and that, although he could not recall any specific incidents, Dr. D'Angelo had "probably" expressed that sentiment to someone outside the Clinic. (Kish Dep. at 54.)

**19.** The record indicates Dr. D'Angelo threatened to move patients to a different hospital over quality of care issues, but that these threats were not taken seriously. (Kish Dep. 32; DiLuzio Dep. 89; Diluzio Aff. 1.)

**20.** (Pls.' Ex. 9.)

Hamot. This evidence does not reasonably support the existence of a collateral conspiracy to block the entry of managed care in the Erie health care market. It follows, of course, that if there is insufficient evidence that such a conspiracy existed, such a conspiracy could not provide a motive for Hamot to conspire against Plaintiffs.

Finally, as Hamot correctly points out, Plaintiffs' theory of Hamot's participation in the conspiracy is implausible in light of the record. If Hamot desired to eliminate Dr. Hanson's practice, it could have done so in 1989 by refusing to lift its moratorium on credentialling new surgeons so that Dr. Hanson could not recruit a new partner and terminating his privileges based on his failure to meet the volume requirement. Such a peer review action would have enjoyed a presumption of immunity under the HCQIA. *See Mathews,* 87 F.3d at 633; note 14 supra. Yet, the record demonstrates that Hamot did exactly the opposite. Beginning in December 1988, Hamot repeatedly granted Dr. Hanson numerous exceptions to the volume requirement and permitted him to recruit Dr. Comer and then Dr. Kerth. Additionally, after initially taking action against Dr. Hanson in 1990 based on the volume requirement, Hamot abandoned the volume requirement at Dr. Hanson's request and permitted him to regain his privileges. Only after his group's annual surgical volume had fallen into the teens did Hamot reinstate the volume requirement and terminate Dr. Hanson's privileges. Plaintiffs have presented no plausible explanation for why Hamot would engage in this course of conduct while simultaneously participating in a clandestine campaign to destroy their practice by pressuring Medicor to reduce the number of referrals it was providing to Dr. Hanson's group.[21]

*Medicor's Motive*

Medicor also argues that it had no economic motive to join the alleged conspiracy. Medicor points out that it has no economic interest in affecting the number of cardiovascular surgeons at Hamot because none of its employees perform open heart surgeries.

Rather, the cardiologists refer every heart patient who needs surgery to a cardiovascular surgeon who has no economic connection to Medicor. If anything, Medicor argues, there is a basic market incentive for its cardiologists to refer patients to a surgeon who they believe will provide the best care because the success of the surgery will reflect on the soundness of the cardiologist's medical judgment in making the referral.

Plaintiffs suggest Medicor had an economic incentive to join the conspiracy because Hamot and the Clinic were both threatening to disrupt the success of its practice if it refused to refer exclusively to the Clinic. Hamot was supposedly applying economic pressure on Medicor by threatening to grant privileges to competing cardiologists if Medicor did not refer exclusively to the Clinic. The Clinic was supposedly applying economic pressure by threatening not to make reciprocal referrals to Medicor. Neither of these contentions is supported by the record. We will address each one in turn.

Plaintiffs give the following explanation of the alleged coercive pressure being applied to Medicor by Hamot:

> Here, Hamot's and Medicor's participation in an exclusion not otherwise advantageous to them, was economically beneficial to them because of [Dr.] D'Angelo's ability to play on the interdependence among the defendants—Hamot's dependence on D'Angelo, and Medicor's dependence on D'Angelo and its exclusive "franchise" from Hamot.

(Pls.' Br. at 62.) According to Plaintiffs, Dr. D'Angelo was able to "play" on the economic "interdependence" of Hamot and Medicor in the following manner: Dr. D'Angelo exerted coercive economic influence over Hamot by threatening to move the Clinic's practice to another hospital. This was done to coerce Hamot into pressuring Medicore to refer exclusively to the Clinic. Hamot had influence over Medicor because Hamot had granted Medicore a quasi-exclusive "franchise," in return for which Medicor promised to admit its patients exclusively to Hamot. At the same

---

**21.** At oral argument, Plaintiffs speculated that this anomaly could be viewed as an attempt by Hamot to cover its tracks to avoid an antitrust suit. (Tr. at 99–100.) There is no evidence suggesting such a tactic was ever considered.

time, Medicor was also under coercive pressure from a reciprocal/exclusive referral agreement with the Clinic, under which Medicor would lose some portion of its revenue if it did not refer exclusively to the Clinic. This theory is both unsupported by the record and theoretically self defeating.

The theory is unsupported by the record because Plaintiffs have produced no evidence from which it could reasonably be inferred that Hamot ever threatened to grant privileges to a competing group of cardiologists if Medicor did not refer exclusively to the Clinic. Plaintiffs' evidence supporting this theory consists of an alleged statement made by Dr. Charles Furr, a senior Medicor cardiologist and member of Hamot's Board, to Dr. Kerth indicating he was not referring cases to Dr. Kerth because "Hamot's Board only wanted one cardiac surgery group." (Kerth Dep. at 178.) This statement does not support the reasonable inference that Medicor was capitulating to threats from Hamot's Board. In fact, Dr. Kerth acknowledged there was no evidence that such threats were ever made, but simply speculated about how "it's conceivable that this may have crossed someone's mind at one time" and "it's within the realm of possibility." (Kerth Dep. at 742–743.)

Additionally, the idea that Hamot was pressuring Medicor to refer exclusively to the Clinic because the Clinic was threatening to move to another hospital is theoretically self defeating in light of fact that Plaintiffs have also alleged Medicor had an exclusive agreement with Hamot. Under such a scenario, if the Clinic were to move to a competing hospital, the Clinic would loose its referrals from Medicor because Medicor would have to honor its exclusive agreement with Hamot by referring its open heart surgery patients to surgeons who practiced at Hamot. Ironically, the consequences of such a scenario would be a likely increase in the number of referrals to the Plaintiffs, who would, at least temporarily, be the only open heart surgery referral option at Hamot.

Plaintiffs also contend that Medicor was referring exclusively to the Clinic out of fear of loosing reciprocal referrals. Plaintiffs claim that unique referral patterns existed in Erie which permitted the Clinic to exert economic pressure on Medicor. According to Plaintiffs, in Erie, a substantial portion of heart patients were referred by their primary care physician directly to the Clinic, rather than to a cardiologist. The Clinic would then refer such heart patients to Medicor for testing and evaluation prior to undergoing surgery. Plaintiffs allege Medicor received twenty percent of its patients from the Clinic in this fashion, giving the Clinic considerable economic influence over Medicor.

The evidence adduced suggests that at the time of the events in question, such referrals actually accounted for approximately five percent of Medicor's business. (Furr. Dep. 201; Ferraro Dep. 138–40). Moreover, there appears to have been little incentive for any individual cardiologist to act out of fear of loosing such referrals because the Medicor cardiologists are not compensated based on individual productivity. Rather, associates are paid a flat salary and partners receive an equal share of the equity irrespective of their productivity. This compensation structure is of particular importance because the deposition testimony of Dr. Demjanenko, relied on by Plaintiffs to establish that some Medicor cardiologists felt pressure to refer to the Clinic, also indicates that if one Medicor cardiologist lost referrals from the Clinic, those referrals would likely go to a different Medicor cardiologist.[22] (Demjanenko Dep. at 13–14.)

More importantly, however, there is nothing in the record suggesting that a coercive reciprocal agreement actually existed. Plaintiffs acknowledge they can not produce an express agreement. Rather, Plaintiffs point to a number of statements which they claim confirm the existence of "an implicit agreement ... between Medicor and the Clinic to restrict referrals among themselves and limit referrals to [P]laintiffs." (Pls.' Opp. Br. at 9.) These statements were supposedly made

---

**22.** Plaintiffs' attempt to defeat this fact consists of speculation about how the individual bonuses of the Medicor cardiologists "must be conditioned to some degree on their productivity." (Pls.' Br. at 10 n. 4.)

to the Plaintiffs in 1989 when they went searching for an explanation for the sudden drop in their referrals. The statements consist of Dr. Kerth's deposition testimony concerning conversations he had with Medicor cardiologists Dr. Paul Demjanenko and Dr. Francis Nullet (Kerth Dep. at 631, 636) and an inadmissible hearsay statement allegedly made by a Medicor secretary named "Eve" (Dombrowski Aff.).

According to Dr. Kerth, Dr. Demjanenko explained that he only referred to the Clinic because,

> he feared referring cases to Hanson and Kerth because he feared that if he referred patients to Hanson and Kerth they would make D'Angelo unhappy, and he feared that he may not get referrals from Dr. D'Angelo in return.

(Kerth Dep. at 740.) Dr. Nullet allegedly told Dr. Kerth that

> it was difficult for young cardiologists to refer cases outside the D'Angelo group.

(Kerth Dep. 199–200.)

These statements do not reasonably support the inference of a reciprocal referral agreement. The statements are equally as consistent with an inference that the cardiologists were acting out of a unilateral desire to obtain Dr. D'Angelo's return business as they are with the inference that the cardiologists were acting pursuant to an agreement. A unilateral choice to do business with another in hopes of maintaining that person's return business is an everyday occurrence and is purely independent action.

The "Eve" statement was made to Dr. Hanson's secretary during a lunch date. Eve supposedly indicated that Medicor dealt "exclusively" with the Clinic and that the offices of Medicor and the Clinic had "combined." (See Dombrowski Aff.) Since Plaintiffs have not adequately qualified this statement as a hearsay exclusion under Fed. R.Evid. 801(d)(2), we will not consider it in opposition to Defendants' motions for sum-

mary judgment.[23] *Hlinka v. Bethlehem Steel Corp.*, 863 F.2d 279, 282 (1988).

*The Attendant Concerns of Matsushita*

As the Third Circuit has explained, the attendant concerns of Matsushita are implicated when (1) the plaintiff's conspiracy theory is economically implausible and (2) permitting an erroneous inference of antitrust conspiracy under the circumstances would have the effect of deterring significant procompetitive conduct. *Petruzzi's IGA*, 998 F.2d at 1232. Both concerns are implicated here.

As discussed above, Plaintiffs' attempts to explain why Hamot and Medicor would ignore market forces and join the alleged conspiracy rely on unsupported speculation concerning threats and economic coercion. Moreover, permitting an erroneous inference of antitrust conspiracy under the facts of this case would not only deter significant procompetitive conduct, it would "pose grave and unusual dangers to the proper administration of health care." *Pontius*, 552 F.Supp. at 1362. Undoubtedly, there is a strong public interest in encouraging physicians to use their best judgment when making referrals and in encouraging hospitals to maintain quality of care by regulating physicians. It would pose a grave threat to these interests if physicians and hospitals, exercising these important functions, were forced to weigh patient care against the prospect of incurring antitrust liability based on unsupported, speculative allegations that their actions were the product of coercive conspiracies with surgeons who happened to fare better under such a system.

### B. Contract, Combination or Conspiracy

Even when a plaintiff's conspiracy theory is plausible, antitrust law limits the inferences that can be drawn from ambiguous conduct. *Monsanto*, 465 U.S. at 763–64. A plaintiff must reasonably exclude the possibility that the defendants acted independently. *Id.* at 764. When a plaintiff's conspiracy

---

**23.** Even if the statement were admissible, it would not be sufficient to create a material issue of fact so as to help defeat summary judgment. The statement is little more than a comment acknowledging that Medicor was referring exclusively to the Clinic—a fact that is not in dispute. The issue is not *whether* Medicor was referring exclusively to the Clinic, but rather *why* it was doing so.

theory does not make economic sense, a plaintiff must produce more persuasive evidence to support their claim than would otherwise be necessary. *Matsushita*, 475 U.S. at 587. The conspiracy in this case is contrary to the rational economic self-interest of both Hamot and Medicor. Plaintiffs' attempts to explain how the conspiracy enured to their benefit is unsupported by the evidence. Thus, we are left to consider whether sufficient unambiguous evidence has been adduced which would permit an inference that the alleged conspiracy actually existed.

Plaintiffs' efforts to establish the existence of the alleged implicit agreement is threefold. First, Plaintiffs rely on the motive evidence which has been discussed and rejected in the preceding subsection of this opinion. Second, Plaintiffs argue such an agreement can be inferred from the fact that Medicor can not adequately explain its referral patterns in terms of medical judgment. Third, Plaintiffs argue such an agreement can be inferred from various policies implemented by Hamot which demonstrate a commitment to the destruction of Plaintiffs' practice.

*Plaintiffs' Surgical Competence*

Plaintiffs argue a reasonable factfinder could infer that Medicor's referral patterns were the product of a conspiracy from the fact that the Medicor cardiologists stopped referring to Dr. Hanson's group without a compelling "quality of care" justification. Contrary to Plaintiffs' contentions, concerted action in furtherance of an illegal conspiracy can not be inferred from Medicor's failure to "demonstrate a *marked* disparity between [P]laintiffs' and the Clinic's competence." (Pls.' Surreply Brief at 5 (emphasis supplied)).

A similar argument was addressed and rejected by the Eighth Circuit in *Willman v. Heartland Hospital East*, 34 F.3d 605 (8th Cir.1994), *cert. denied*, 514 U.S. 1018, 115 S.Ct. 1361, 131 L.Ed.2d 218 (1995). *Willman* involved the termination of a surgeon's staff privileges. *Willman*, 34 F.3d at 607. The surgeon sued the hospital and physicians involved in the peer review action claiming, among other things, that the defendants conspired to terminate his staff privileges in

violation of section 1 of the Sherman Act. *Id.* at 609. The plaintiff argued he could demonstrate the peer review proceedings were a "sham" and that his privileges were actually terminated for the unlawful purpose of preventing him from competing with the defendants by adducing evidence that created a genuine issue as to whether the peer reviewers had reached the wrong result and removed a qualified physician. *Id.* at 610. The Eighth Circuit held that such evidence, even if capable of showing the plaintiff was competent, could not create a material issue of fact concerning whether the defendants had conspired in pursuit of an unlawful objective. *Id. (citing American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946) (arrangement must be for an unlawful purpose) and *Lie v. St. Joseph Hosp.*, 964 F.2d 567, 570 (6th Cir.1992) (monitoring competence through peer review is lawful and in the public interest)). The court observed that

> whether [plaintiff] actually provided substandard care is not the proper question. Rather, we must decide whether [plaintiff's] peer reviewers could have reasonably concluded that he provided substandard care.

*Id.* at 611.

We think this rationale applies with equal force to the referral practice being challenged here. Making referrals based on medical judgment is not only a lawful objective, it is also strongly in the public interest. Referring physicians must be accorded considerable latitude to make referrals based on their patients' best interests.

The issue here is not whether the Plaintiffs were in fact competent, but rather whether the Medicor cardiologists were justified in believing that their patients would be in better hands if they were referred to a member of the Clinic. In this respect, the Plaintiffs can successfully raise the reasonable inference that the Medicor cardiologists were referring in furtherance of an unlawful purpose only by demonstrating that no reasonable medical justification existed for their referral practice. As in *Willman*, Plaintiffs have not met this standard. Plaintiffs have merely succeeded in creating a material issue of fact

concerning whether they were technically competent. However, as this Court has observed, technical competence is not the only factor to considered when making medical referrals. *See Robinson v. Magovern*, 521 F.Supp. 842, 890 (W.D.Pa.1981) (observing that referrals are based on ability, availability and affability).

Additionally, while this Court has recognized that referral patterns developed over time tend to be more stable, *Robinson*, 521 F.Supp. at 890, the continued stability of such patterns obviously depends upon an ongoing level of comfort with the surgeon(s) to whom cases are being referred. In this respect, Dr. Hanson, after losing his partners and being forced to recruit new ones, was not automatically entitled to continue receiving referrals from Medicor simply because he may have received them in the past. Additionally, Dr. Kerth, as a new surgeon, was not entitled to immediate and substantial referrals upon entry into a market in which referral patterns to the Clinic already existed. *Id.* at 891.

The record is replete with evidence, including deposition testimony and affidavits, supporting the idea that the Medicor cardiologists lost confidence in Dr. Hanson's practice when his partners, Drs. Forman and Cunningham, left Erie. As Dr. Hanson himself explained:

> Well, I think that a change in practice where you go from a two man practice to a one man practice and there is a long hiatus where cases can't be referred because there is no assistant, and a negative impact on a practice, and I think once a practice is reestablished, as it was with Dr. Kerth, that practice needs time to rebuild.

(Hanson Dep. 424).

■ Medicor cardiologists have further explained that prior to 1989 they considered Dr. Hanson's practice stable and were comfortable referring patients to him because he had strong partners. This comfort level was disrupted when Drs. Forman and Cunningham left Erie. Additionally, Dr. Hanson was without a partner for a significant period of time in 1989. During 1989, the Medicor cardiologists began referring an increasing number of their patients to the Clinic.[24] The cardiologists were happy with the results they received from the Clinic. When Dr. Hanson recruited Dr. Kerth, the Medicor cardiologists did not regain their previous level of comfort with his group. They had legitimate concerns about Dr. Kerth's lengthy absence from the practice of open heart surgery. Consequently, Dr. Hanson's group was not able to "reestablish" itself and the cardiologists simply saw no reason to refer cases there at all when the Clinic was providing satisfactory care. Because the undisputed record is consistent with this explanation, it would be unreasonable to conclude that the Medicor cardiologists' referral practices were devoid of medical justification. As such, the change in Medicor's referral patterns can not support an inference of an illegal conspiracy.

*Hamot's Policies*

Plaintiffs also claim that a conspiracy can be inferred from various staffing policies and marketing efforts undertaken by Hamot. We address each of these initiatives according to the categories used by Plaintiffs.

### i. The First Assistant Rule & Volume Requirement

Plaintiffs claim a conspiracy can be inferred from Hamot's first assistant rule and its open heart surgery volume requirement. First, we point out that these rules regulate the practice of cardiovascular surgery, not cardiology, and thus have nothing to do with whether Plaintiffs received referrals from Medicor. Nevertheless, Plaintiffs claim that these rules were used (or misused) by Hamot to "get them" and to "facilitate" the destruction of their practice.

Temporally, Plaintiffs' claims are implausible because the rules were adopted in 1984, some five years prior to the alleged conspiracy and at a time when Dr. Hanson's practice was growing. There is no evidence that the Clinic was involved in the adoption of these

---

24. In this respect, the record reflects that a trend to refer to the Clinic in lieu of Dr. Hanson's group was already developing prior to the December 1989 staffing meeting which Plaintiffs claim marked the first overt act in furtherance of the conspiracy to deny them referrals.

rules; or even that the Board's implementation of these rules was motivated by anything other than a concern for quality of care.

There is no evidence supporting Plaintiffs' claim that the first assistant rule was adopted because of the onerous effect it would have on small practices that competed with the Clinic. The evidence adduced by Plaintiffs in support of this contention consists of deposition testimony by Dr. Marshall, a former Clinic surgeon, who indicated Dr. D'Angelo told him he liked the rule because

> number one, it allows us to charge a first assistant's fee, which generates more money. And, number two, it keeps competition away.

(Marshall Dep. at 36.) Plaintiffs also cite to their own deposition testimony containing their belief that the Clinic had a policy of refusing to assist them in non-emergency situations. Dr. Kerth stated he believed such a policy existed based on "what [he] understood from Hanson." (Kerth Dep. 658.) Dr. Hanson testified he believed such a policy existed because Dr. Tan and Dr. Kish had refused to assist him on two occasions.[25] (Hanson Dep. 480–91.) According to Dr. Hanson, when he asked Dr. Kish why he would not provide assistance, Dr. Kish said Dr. D'Angelo would not permit him to assist the competition. (Id. at 483.)

This evidence, when taken as true, focuses entirely on the independent conduct of the Clinic Defendants. The evidence goes to whether the Clinic took advantage of the rule's incidental effects on their practice, not to whether Hamot adopted it in order to destroy their practice. Irrespective of any probative value this evidence may have concerning the conduct of the Clinic, it does nothing to exclude the possibility that Hamot acted independently when it enacted the rule;

and that Hamot did so out of a good faith belief that the rule was in the interest of quality of care.

Plaintiffs also claim there is evidence that Hamot selectively enforced the volume requirement to eliminate Dr. D'Angelo's competition. As evidence, Plaintiffs cite to the fact that Dr. Sherafat, a surgeon who was fired from the Clinic and attempted to practice on his own at Hamot, lost his privileges under the auspices of the volume requirement while no action was taken against Dr. Kish (a member of the Clinic) when he did not meet the volume requirement. For a variety of reasons, this evidence does not demonstrate selective enforcement against the Clinic's competition.

■ Plaintiffs have produced no evidence that any member of the Clinic was involved in the termination of Dr. Sherafat's privileges.[26] As for Dr. Kish, the record demonstrates that he in fact never actually failed to meet the volume requirement. While Dr. Kish did not perform twenty five procedures as the primary surgeon between July 1984 and July 1985, he was subject to a grandfather clause under which existing surgeons were given until November 1986 to comply with the criteria. More importantly, however, the very idea that the volume requirement was selectively enforced against the Plaintiffs' practice is belied by the uncontradicted record. As discussed in detail earlier, Dr. Hanson was repeatedly granted exceptions to the volume requirement beginning in 1988. In fact, the requirement was abandoned at his request and was only reimposed when his group's surgical volume became so low that Hamot reasonably believed it could not meaningfully measure the quality of care Plaintiffs were providing.[27] No reasonable factfinder examining this evidence could con-

---

**25.** Dr. Hanson never asked any of the other Clinic Defendants to assist him. (Id. at 487.)

**26.** Dr. Hanson stated Dr. Furr told him the criteria was "designed to get Sherafat." (Hanson Dep. 158.) This statement does not show that Dr. D'Angelo was involved in the implementation of the rule or that it was designed to "get" surgeons who competed with the Clinic.

**27.** Plaintiffs suggest that Hamot's concern for its inability to measure their quality of care should

be viewed as pretext because Hamot could have obtained a statistically significant sample of their surgeries by counting surgeries from past years. As already discussed, contemporary studies had linked maintaining surgical volume to quality of care. Thus, Hamot was perfectly justified in requiring a minimum level of proficiency. Second, Hamot had a legitimate interest in measuring quality of care based on recent surgeries rather than those occurring several years prior.

clude that the volume requirement was selectively enforced against Plaintiffs' practice in furtherance of a conspiracy.

### ii. The Physicians Referral Network

Hamot maintained a marketing initiative called the Physicians' Referral Network ("PRN") Part of the PRN's activities involved arranging meetings with physicians in outlying areas to educate them about services and facilities available at Hamot. The trips were organized by low level nurse liaisons at Hamot.

Plaintiffs allege that Hamot used the "PRN" to further the conspiracy by refusing to permit them to participate in these trips, thus blocking their access to alternative sources of referrals. Additionally, Dr. Kerth testified that when he approached Hamot's C.E.O., Dana Lundquist ("Lundquist"), to voice his concern about not being included in the PRN, Lundquist reportedly "chuckled" and told Dr. Kerth the only way to practice cardiovascular surgery at Hamot was to be in the D'Angelo Group. (Kerth Dep. at 204–05.) This evidence does not support the inference of a conspiracy.

Nothing in the record suggests that Plaintiffs' exclusion from these trips was anything other than unilateral action by low level employees. The uncontradicted testimony of the nurses responsible for the trips indicated they were never instructed to favor any physician or exclude another from PRN activities. (Balogna Dep. at 32.) Lundquist's statement, at best, is a factual comment on the state of referral patterns at Hamot. It does not suggest that those referral patterns are the result of concerted action.

### iii. Joint Ventures

Plaintiffs also claim a conspiracy can be inferred from the fact that Plaintiffs were denied the opportunity to participate in joint ventures. Plaintiffs complain they were promised, but denied participation in a cardiac fitness center ("CFC"), a for profit cardiac rehabilitation and diagnostic facility owned by a group of investors which included Hamot, Medicor and Dr. D'Angelo. According to Plaintiffs, Dr. D'Angelo and Medicor opposed granting the Plaintiffs an opportunity to participate in the venture. None of the Defendants were under an obligation to go into business with Plaintiffs and any inference of a conspiracy from their failure to do so is unreasonable.

### iv. Marketing Support

Plaintiffs also claim that a conspiracy can be inferred from the fact that the Clinic received preferential advertising treatment. The first instance of preferential marketing support cited by Plaintiffs involves the fact that Dr. D'Angelo was featured in a Hamot newspaper advertisement commemorating the 30th anniversary of the first open heart surgery performed in Erie. (Pls.Ex.16.) The second instance of preference is the fact that Plaintiffs were left out of a group photograph in the *Erie & Chautauqua Magazine* entitled "Hamot's team of cardiac specialists." (Pls.' Ex. 17.) The photograph was part of an advertisement commemorating the high rating Hamot physicians had received in a 1992 study performed by the Pennsylvania Health Care Cost Containment Council. (Id.) These advertisements promoted specialty services at Hamot, not the individual physicians. Dr. D'Angelo's inclusion in the newspaper advertisement is obvious; he performed the surgery. Plaintiffs exclusion from the second advertisement is likewise obvious; they had not performed enough surgeries to receive individual ratings and their surgical group, as a whole, experienced a statistically high rate of mortality.

Plaintiffs also claim that a conspiracy can be inferred from the fact that Hamot refused to partially fund Dr. Hanson's personal marketing plan. There is no evidence that Hamot funded any similar personal marketing plan for the Clinic, or for any other physicians. Additionally, the deposition testimony of Wilmer K. Calvin ("Calvin"), the consultant who developed Dr. Hanson's marketing plan, simply does not link Hamot's refusal to fund Dr. Hanson's plan to pressure from Dr. D'Angelo. Calvin concludes that Hamot's decision was the result of "pressure on Hamot ... from D'Angelo" based on "feedback" from unspecified "sources[,] ... people on staff" and "constant reports from Drs. Hanson and Cunningham." (Calvin Dep. 16–17.) There is no indication that Calvin had any

personal knowledge that such pressure was ever exerted. There is no basis from which to infer Hamot's decision not to spend its money on Dr. Hanson's personal marketing plan was anything other than a manifestation of business judgment.

## 2. The Section 2 Claims

■ In Count IV of their complaint, Plaintiffs claim the Clinic Defendants attempted to monopolize the relevant market for adult open heart surgery in violation of Section 2 of the Sherman Act. "To demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving market power." *Pastore v. Bell Telephone Co. of Pennsylvania,* 24 F.3d 508, 512 *(citing Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993)).

Plaintiffs' evidence of predatory or anticompetitive conduct essentially fits into two categories. First, Plaintiffs rely on the alleged "threats and coercion" that were "instrumental in getting Medicor to ratchet down its referrals" and "getting Hamot to exclude [P]laintiffs from ... every possible outlet for [P]laintiffs to establish new referral sources." (Pls.' Br. at 70.) This is the same conduct that formed the basis of Plaintiffs' section 1 claims. Since we have already concluded there is no evidence such threats were ever made, it follows that such threats could not have been instrumental in the decline of Plaintiffs' practice.

Second, Plaintiffs rely on the Clinic Defendants' alleged failure to assist them in non-emergency situations. Specifically, Plaintiffs claim Dr. D'Angelo forbade Clinic surgeons

from assisting Plaintiffs in non-emergency situations in order to make it practically impossible for their two man practice to survive under Hamot's first surgical assistant rule. Defendants have supplied affidavits and deposition testimony denying that such a policy existed. They also point to evidence that they in fact assisted Plaintiffs on several occasions. Plaintiffs' contrary evidence is sufficient to create a material issue of fact concerning whether such a policy existed at the Clinic. Thus, we are left to determine whether, under the circumstances of this case, such a policy could have violated Section 2 of the Sherman Act.[28]

■ The antitrust laws generally impose no duty to assist a competitor. *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919). Plaintiffs argue that the Clinic's policy here fits either the "intent" test[29] or the "essential facilities"[30] exception. We need not address these arguments, however, because under the facts presented, the Clinic's failure to assist Plaintiffs could not have caused the Clinic to obtain or maintain a monopoly. As previously discussed, Plaintiffs' practice failed because they did not get enough referrals, not because they did not receive assistance from the Clinic. In other words, this is not a case where Plaintiffs went out of business because they had to pass on large number of referrals because they could not find assistants. Quite to the contrary, Plaintiffs routinely provided assistance for each other on the cases they received.

## 3. State Law Claims

Count V contains state law antitrust claims based on the same conduct Plaintiffs claim violated the Sherman Act. Since these claims

---

**28.** We do not read Plaintiffs' complaint to allege that such a policy would constitute an illegal combination or conspiracy among the individual Clinic Defendants under Section 1 of the Sherman Act.

**29.** Under the "intent" test, "a business is free not to deal with whomever it pleases so long it has no 'purpose to create or maintain a monopoly.'" *Byars v. Bluff City News Co., Inc.,* 609 F.2d 843, 855 (6th Cir.1979) *(citing Colgate,* 250 U.S. at 375).

**30.** The "essential facilities" doctrine applies when a plaintiff can show "(1) control of the essential facility by a monopolist; (2) the competitor's inability practically or reasonably to duplicate the essential facility; (3) denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.,* 90 F.3d 737, 748 (3d Cir.1996) (citations omitted).

mirror the federal antitrust claims, they rise or fall with Plaintiffs' federal antitrust claims and will receive like disposition. See *Alvord–Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1014 (3d Cir.1994), *cert. denied,* 514 U.S. 1063; 115. S.Ct. 1691, 131 L.Ed.2d 556 (1995).

 Count VI contains a state law claim for tortious interference with prospective business relations. To establish a claim for tortious interference with prospective contractual relationships, among other things, a plaintiff must prove the existence of prospective contracts. *Alvord–Polk,* 37 F.3d at 1015 (*citing Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466, 471 (1979)). "A prospective contract is something less than a contractual right, something more than a mere hope." *Id.* It exists if there is a reasonable probability that a contract will arise from the parties' current dealings. *Id,* (*citing Glenn v. Point Park College,* 441 Pa. 474, 272 A.2d 895, 898–99 (1971)).

Defendants argue Plaintiffs can not identify, with reasonable probability, any future contracts that were tortiously interfered with for the same reason Plaintiffs can not show antitrust violations. Plaintiffs, relying on *Posner v. Lankenau Hosp.*, 645 F.Supp. 1102, 1111–12 (E.D.Pa.1986), contend that they are not required to identify specific business relations that were lost or interfered with to survive summary judgment. To the extent that *Posner* can be reconciled with the Third Circuit's review of Pennsylvania law in *Alvord–Polk,* it is inapposite to the case at hand. The *Posner* court denied summary judgment on the grounds that a "question of fact exist[ed] concerning the reasonableness of plaintiff's expectation of gaining referrals from other physicians at [the hospital]." *Posner,* 645 F.Supp. 1102. In light of the fact that Medicor was the only significant source of open heart surgery referrals at Hamot and our previous conclusion that Medicor's referral patterns were the product of independent medical judgment, no similar questions remain in this case.

## IV. CONCLUSION

An appropriate order follows.

*ORDER*

AND NOW, this 30th day of September, 1997, for the reasons stated in the accompanying Memorandum Opinion, IT IS HEREBY ORDERED that the following Defendants' motions for summary judgment are granted:

1. The D'Angelo Clinic, George J. D'Angelo, M.D., George F. Kish, M.D., Prabhaker G. Sardesai, M.D. and Wilfredo S. Tan, M.D. [Doc. No. 116];

2. Medicor Associates, Inc. [Doc. No. 124];

3. Hamot Health Foundation and Hamot Medical Center of the City of Erie, Pennsylvania [Doc. No. 137].

JUDGEMENT IS HEREBY ENTERED in favor of the Defendants and against Plaintiffs. The Clerk is instructed to mark the case closed.